William Sidney Sturgeon and Violet Sturgeon,
                        *Plaintiffs and Appellants*
        vs.

A. B. Brooks and Fern Brooks,
                        *Defendants and Respondents.*

(No. 2653; March 28th, 1955; 281 Pac. (2d) 675)

438

For the plaintiffs and appellants the cause was submitted upon the brief of G. R. McConnell and Walter Scott both of Laramie, Wyoming and oral argument by Mr. McConnell.

For the defendants and respondents the cause was submitted upon the brief of Sullivan and Sullivan of Laramie, Wyoming, and oral argument by Mr. J .R. Sullivan.

440

## OPINION

BLUME, Justice.

This is an action brought by the plaintiffs against the defendants to prevent the latter from repairing the dam of the reservoir called the M G Reservoir located in the main in the NW½ of Section 2, Township 23 North, Range 73, and extending partially into Section 35, Township 24 North, Range 73 West of the

6th P. M. Plaintiffs alleged that they are the owners of Section 2, supra; that while Margaret D. McGill and John McGill had a permit from the State Engineer of Wyoming to construct the M G Reservoir, they had no authority to construct it; that they never obtained any authority from the United States to do so; that it washed out and had been abandoned for more than ten years and until 1952 at which time defendants attempted to reconstruct it by constructing a dike or dam; that defendants have not filed any annual reports with the water commissioner nor did they file a deed for the reservoir water and water rights connected therewith as required by § 71 615, W.C.S. 1945; that defendants failed to use the water from the reservoir for a period of five consecutive years and are now trespassing upon the land of the plaintiffs; that they are attempting to construct a dike higher than it was originally. Plaintiffs accordingly ask for an injunction against the defendants to repair or reconstruct the reservoir above mentioned. Plaintiffs also seek damages in the sum of $500.

The defendants denied that the reservoir and its rights were abandoned and alleged that predecessors to the defendants obtained a permit from the State Board of Control to construct the reservoir as above mentioned; that the patent to the NW½ of Section 2 contained a reservation that it was subject to any vested or accrued water rights; that the reservoir in no manner injures the plaintiffs and that the latter have sustained no damages; that plaintiffs consented to the repair of the reservoir and made no objection thereto. The trial court found against the plaintiffs in the case and in favor of the defendants and dismissed the action. From that judgment, the plaintiffs have appealed and the parties are hereinafter referred to in the same manner as in the court below.

The essential facts in this case are not greatly in dispute, although there is some discrepancy in connection with the dates referring to the early part of the century. It appears herein that in 1902, Margaret O. McGill and John McGill, predecessors in interest of the defendants, received a permit from the State Engineer to construct a reservoir on the property hereinafter mentioned in order to store water from Duck Creek in Albany county, Wyoming. They received a Certificate of Water Apropriation from the State Board of Control in this state dated December 17, 1910. The certificate recites as follows:

"Said reservoir is located in the N½NW¼ Sec. 2, Tp. 23 N and S½ SW¼ Sec. 35, T.p 24 N,, R. 73W., Albany County, Wyoming, and said appropriation of water stored therein is for the irrigation of land described under the M G No. 2 Ditch Permit No. 4056, Cert. Rec. No. 31, page 146, The M G No. 3 Ditch Permit No. 4055, Cert. Rec. No. 31, page 147, and the M G No. 1 Ditch Permit No. 4057, Cert. Rec. No. 31, page 148."

This certificate of appropriation apparently attached the reservoir and the rights therein to the lands owned by the McGills. These lands are not specified in the certificate but by exhibits A and 3a, which consist of maps indicating the M G Ditch Nos. 2 and 3, showing that lands irrigated by these ditches are located in Sections 29, 30 and 32, Township 24, Range 72 West. Counsel in connection with the testimony mentioned the "Kite Ranch" and the "Mertz Ranch" as though we took judicial notice of the location thereof, when, of course, we never heard of them. We take it, however, by inference that the defendants now own the land which was formerly owned by the McGills. At least no question is raised in that connection. These lands are located a comparatively short distance north-

east of the M G Reservoir. We must accept as true that, at the time the Certificate of Water Appropriation was issued, the reservoir had been constructed as permitted and required by the State Engineer notwithstanding the fact that the witness Cole testified to the contrary. Wagoner v. Jeffery, 66 Idaho 455, 162 P.2d 400. There is testimony in the record that the reservoir was in good condition at least up to about 1912 and probably for several years thereafter. But in about 1916 or thereabouts part of the dam of the reservoir was washed out. The dam was never completely washed out but had a hole washed out in the middle. It was repaired about 1918 by a party by the name of Cameron. Just how long the reservoir remained in condition for holding water after 1918 is not clear. But at least commencing with about 1922, part of the dam washed out again and remained washed out by reason of a hole in about the center of the dam of the reservoir until 1951. It ssems the defendants herein became owners of the land originally owned by the McGills about 1942. There was some consideration given to the repair of the dam in 1946 or 1947. It was intended to use a pipe and valve in repairing it but at that time the material therefor was not obtainable because of scarcity of goods due to the war. But in 1951, Brooks repaired the dam, filled in the breach that had been washed out, placed a conduit pipe and valve and filled the breach with stone and rubble and earth. Part of the dam washed out again in the spring of 1952, but was immediately repaired and, according to the testimony of Brooks held about six feet of water, which he used on his land. In the spring of 1953, the reservoir held about eight feet of water, which was used by Brooks for irrigation. It would seem that from the spring of 1952 to and including the spring of 1953, Brooks worked more or less on the dam so that it would be secure, and would have finished his work within

about a week when summons of an injunction in this case was served on him and he then stopped. The conduct of the parties prior to that is shown by the following detailed testimony. Sturgeon testified in part as follows:

"Q. Did you ever talk to him (Brooks) about going upon your land to repair the M G Reservoir? A. Well, I talked to him about 10 years ago. At that time we talked this situation over and I told him that when he got ready to put in his reservoir, why, he could come up and we would come into Laramie and we would have an agreement drawn up where it would be satisfactory, maybe, to both of us.

"Q. Now, in 1953 did you ever talk to him about the reservoir? A. Yes.

"Q. And what did you do in reference to your talk?

A. Well, I went down and told him that I would like to have an understanding, that I would like to come here to Laramie and have something drawn up in writing and recorded.

"Q. When did you find out that any work had been done on the reservoir? A. Well, he started work on it in '51, he put it in.

"Q. Did you know about it? A. Yes, I knew about it.

"Q. When did you find out? A. Well, I knew it right along. He was there working and I supposed that maybe he would come up some day and we would come to Laramie, but he never came until I went down and contacted him.

"Q. And when was that you contacted him? A. Well, it was in August '52.

"Q. Now, in '51, while you saw him working, what did you do? A. I didn't do anything.

"Q. Now, you stated that you knew that Mr. Brooks was repairing this in 1951. A. Yes, sir.

"Q. And you didn't say anything about it? A. We talked it over and I told him when he got ready to put in his reservoir to come up and we would come to Laramie and we would have an agreement drawn up. * * * That was about ten years ago * * * He never did any (work) on it until '51.

"Q. Now, did you have any conversation with him in '51? A. No. I don't recall any conversation with him in '51.

"Q. Were you ever over there while he was work ing there? A. Well, I was by there and saw him working.

"Q. Did you ever talk with him about it? A. No. I stopped there one day and watched him work a while. He just kept right on working.

"Q. You just passed the time of day? A. Yes.

"Q. How about '52? A. Well, in '52, that was the year it washed out. That was the year we came in here to Laramie to have an agreement drawn up.

"Q. Well, now, what sort of an agreement did you want? A. I wanted an agreement to protect my property below the dam.

"Q. And did you get that agreement? A. No, sir.

"Q. And why not? A. He said that he couldn't sell any of this water nor he couldn't give me any of this water.

"Q. Was that an agreement or were you trying to buy water from him? A. No, sir.

"Q. Well, how does that come about? How did that come out in the conversation? A. For this reservoir, you know, I figured it was built on my land and my dirt that went in it, a man should have some understanding about his dirt or his land that he owns.

"Q. Well, did you want to buy water from him? A. No.

"Q. Now, isn't it a fact that you offered him $500? A. At one time I offered him $500 and he told me, he said, 'I would rather put this reservoir in myself, I don't want any help from anyone.'

"Q. But you offered to pay him $500 towards the repair of the dam, you didn't expect any water, you didn't expect to buy any water from him or anything. A. Yes, sir, I expected water for the land that I had bought. * * I was interested in the dam, I wanted to put money into the dam and show that I had an interest in the dam."

Defendant Brooks, in addition to what has been mentioned testified as follows:

"Q. Now, you heard his (Sturgeon's) testimony about your various conversations respecting the repair of this so-called reservoir. How many conversations did you have with him, Mr. Brooks? A. I don't recall how many, probably half a dozen altogether, probably five or six or seven or eight.

"Q. When you were doing the repair on this dam in 1951, was Mr. Sturgeon around there at any time? A. He and his father and his son drove down there the first day I started to work and wanted to know what they could do to help. I said the only thing I would know to do would be to clean out your ditches

so we can get proper benefit of any water that goes through here once it's completed.

"Q. When did you next see him? A. Oh, I couldn't recall. Every week or two weeks. * * * He made a remark once or twice * * * why I didn't go out on his land away from the dam and get some dirt that was easy to handle . . .

"Q. Was there any other conversation at that time during that year (1952)? A. Yes. He said that he would like to have a piece of paper signed by me in case I died or sold the place that he would be safe after this happened so that he wouldn't be damaged in any way, and I told him we would go down and fix the papers up any time.

"Q. Now, did you ever have a conversation with him whereby he offered to pay $500? A. Yes.

"Q. What was that? A. That was back in about '46 or 7. His brother Bob came to me and he said, 'You fellows ought to get together and build that dam up.' He said, 'It's a shame to let all that flood water go down the creek and none of you get any good of it.' So, I seen Sid shortly after that and mentioned the fact to him and he said, "Yes, when you get ready to build it,' he said, 'I am willing to go 50-50 on it.'

"Q. Now, Mr. Brooks, how long during this year did you work on this ditch (reservoir)? A. From, I think, June the 12th. Until this summons was served on me.

"Q. During that time, did Mr. Sturgeon come to you respecting your work on this? A. He came to me while I was at work and wanted to know if I had ever checked up on the location of the area of this reservoir or the location of the reservoir, and

I told him nothing more than the map that I had. He said that his water book showed it in Section 35 and that when the Water Commissioner was out there he'd mentioned it to her and she had checked with her records and told him that he ought to have it corrected, and it was wrong, that it wasn't in 35 and the books didn't show it in 35, and her records didn't show it in 35. And I said 'Well, what are you going to do about it,' and he said, 'What are you going to do about it?" He said, 'I have got Mr. Mc-Connell working on it now, I am going to test it in court and I would advise you not to do any work because you might lose it and you would be doing that work for nothing.'

"Q. When was that with reference to the time that this— A. That was a few days prior to the serving of this summons.

"Q. Was that the first time that he ever accosted you and told you not to do any work? A. Yes, sir.

Q. Previous to that time he wanted to help you? A. Yes."

Sturgeon and Brooks went to Laramie some time in the fall of 1952, as already noted, to talk to Mr. Millett, an attorney at law. They came to no agreement, at least no written agreement. It further appears that plaintiffs have constructed two reservoirs, one on Duck Creek and one on the North Fork of Duck Creek. The permit for the latter was approved July 3, 1950. It does not appear when the permit for the former was approved.

We take it that plaintiffs and defendants, respectively, are husband and wife. Counsel have presented this case as though the respective husbands represented plaintiffs and defendants respectively. And we

shall do so here. When plaintiff or Sturgeon is mentioned herein, it refers to William Sidney Sturgeon; and when Brooks is mentioned it refers to defendant A. B. Brooks.

We have attempted to give a summary of the essential testimony in this case as nearly accurately as possible. If there are any defects therein, it is due largely to the fact that both counsel for the parties herein completely ignored the provisions of Rule 14 of this court which provides that they should specifically refer to the portion of the record where the question under discussion arises.

1. Water rights on Public Domain.

The NW¼ of Section 2 hereinbefore mentioned was filed upon by one Robert J. Sturgeon about 1917. He received a patent to the land, dated November 15, 1923. By mesne conveyance plaintiff Sturgeon now owns the land. The patent provides that it is "subject to any vested and accrued water rights for mining, agricultural, manufacturing or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws and decisions of courts." That reservation is made in the patent pursuant to the Congressional Act of 1866, (Revised Statutes, §§ 2339, 2340), now contained in 43 USCA, § 661, p. 394, which reads as follows:

"Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and

canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage.

"All patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by this section. (R.S. §§ 2339, 2340)"

It is contended herein by counsel for the plaintiffs that defendants have no vested and accrued rights as mentioned in the section for the reason that the McGills, when constructing the reservoir failed to file a map in the local land office and failed to have such map approved by the Secretary of the Interior as, for instance, provided in 43 USCA, § 947, enacted in 1891, which provides in part as follows:

"Any canal or ditch company desiring to secure the benefits of sections 946 to 949, inclusive, shall, within twelve months after the location of ten miles of its canal, if the same be upon surveyed lands, and if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a map of its canal or ditch and reservoir; and upon the approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office, and thereafter all such lands over which such rights of way shall pass shall be disposed of subject to such right of way. * * * (Mar. 3, 1891, c. 561, § 19, 26 Stat. 1102)"

It may be noted that section 661, supra, makes no requirement for any map to be filed or approved by the Secretary of the Interior. We cannot quite understand why counsel for the plaintiffs have overlooked that that section has many times been construed in conjunction with section 947, supra, and other similar sections and has universally, or almost universally, been construed contrary to the contention of counsel for plaintiffs, the courts holding that section 661, supra, has not been amended or displaced by the later enactments. Counsel for plaintiffs have overlooked the decisions on that point which are as follows: Peck v. Howard, 73 Cal. App. 2d 308, 167 P.2d 753; United States v. Utah Power & Light Co., D.C., 208 F. 821, 10 Cir., 209 F. 554; Rasmussen v. Blust, 85 Neb. 198, 122 N.W. 862, 133 Am. St. Rep. 650; Gila Water Co. v. Green, 27 Ariz. 318, 232 P. 1016; Cottonwood Ditch Co. v. Thom, 39 Mont. 115, 101 P. 825, 194 P. 281; 1 Weil on Water Rights, § 440; Lincoln County Water Supply & Land Co. v. Big Sandy Reservoir Co., 32 Land Dec. Det. Int. 463, 465. Thus, it is said in the last cited case: "While the clause above quoted from section 20 of the act of March 3, 1891 (43 USCA, § 948), extends the benefits of the act to all canals, ditches or reservoirs theretofore constructed upon the public domain, among which is the right to file in that behalf with the land department a map of such canals, ditches, and reservoirs, and secure the approval of the Secretary of the Interior thereof, yet the rights of claimants under section 2339 of the Revised Statutes, (43 USCA, § 661) are in no wise dependent upon * * * an approval of such maps." In Gila Water Co. v. Green, supra, the court said: "The appellant may claim through either or both of these sources. In other words, the Act of 1891 does not repeal sections 2339 and 2340, supra, but is simply a method of acquiring a more extensive and secure right than is gotten through these sources."

And considering a similar situation it was said in the case of United States v. Lee, 15 N. Mex. 382, 110 P. 607, that to make the requirement of filing and approval of a map compulsory would mean a serious step backward on account of the necessary and tedious delays incident to the filing and approval of such maps. The foregoing contention of plaintiffs must accordingly be overruled.

2. Status of Reservoir Rights.

Plaintiffs complain that the defendants did not comply with the provisions of Sections 71-614 and 71-615, W. C. S. 1945. The first of these sections provides that the owners of the reservoir shall annually deliver to the proper water commissioner a list of the parties who are entitled to water from a reservoir. The second of these sections provides that all deeds for reservoir water shall be recorded in the office of the county clerk of the county in which the reservoir is situated and shall also be filed in the office of the state engineer. These sections undoubtedly were enacted for the benefit of the water commissioner so that he may know the parties to whom the reservoir water is to be distributed. We can conceive of no reason why the appellants herein are in any way prejudiced by reason of the non-compliance with these sections.

Counsel for appellants also say that the defendants have no standing in this case because the defendant Brooks testified that he had no deed specifically mentioning the reservoir in question but only a deed conveying to him the lands and the appurtenances pertaining thereto. It is contended that a deed specifically mentioning the M G Reservoir was required before Brooks could claim any right thereto. Section 71-613, W.C.S. 1945, enacted in 1921, provides:

"The reservoir water and rights acquired under res-

ervoir permits and adjudications shall not attach to any particular lands except by deed, or other sufficient instrument conveying such water or water rights, executed by the owner or owners of such reservoirs, and such water and water rights, except when attached to particular lands as aforesaid, may be sold, leased, transferred and used in such manner and upon such lands as the owner of such rights or partial rights may desire, provided, that such water must be used for beneficial purposes."

This section had not been put in issue herein by plaintiffs' pleadings. The petition of the plaintiffs merely complains of the fact that a deed for the reservoir was not filed as above mentioned. However, let us somewhat examine the section in question. The purpose thereof is quite apparent. Prior to 1921 all water rights, including reservoir rights, were attached to land and could not be diverted therefrom. Session Laws of 1909, Ch. 68. The legislation of 1921, as shown by the quoted section changed that rule. The primary purpose then was to permit reservoir rights to be diverted from any particular land. That was doubtless to enable the waters of the state to be utilized more extensively than would otherwise have been possible. The means prescribed by the statute to permit reservoir rights to be so diverted was by deed. The question then is as to whether that method is an indispensible method by which that may be done. The statute deals with the owner of a reservoir on the one hand and the owner of land to be irrigated on the other. Anderson v. Wyoming Development Co., 60 Wyo. 417, 154 P.2d 318, presents a situation of that kind. The statute does not purport to deal with third parties, such as are the plaintiffs herein. Such third party, a stranger to the transaction between the owner of a reservoir on the one hand and a landowner on the

other, should not, ordinarily at least, be permitted to question the dealings between the latter, even though no deed was actually given for a reservoir. The circumstances may be such that equity may require the owner of a reservoir to recognize that a landowner owns a reservoir, or a right therein, even though no deed thereto was given. If that is true as to the owner of a reservoir, much more must be true as to a third party, a stranger to the transaction. So it cannot be said that a deed, specifically mentioning the reservoir rights is a sine qua non under all circumstances to enable a party to assert rights thereto. It is advisable occasionally to remind ourselves of the old adage reading: Summon jus, summa injuria—Strict law may inflict great harm. Hence if the circumstances herein are such as to reasonably lead to the conclusion that defendants should be considered to be the owners of the reservoir in question, then we must disregard the objection of counsel for the plaintiffs above mentioned. We think that to be true in this case.

The statute was probably, in the main at least, intended to apply to cases in which the owner of a reservoir is ready to furnish water to a number of landowners other than himself. That seems to be clear under the provisions of § 71-614, supra. It requires the owner of a reservoir to furnish a list of parties who are to have the water from the reservoir. A list implies two or more parties. The owner of a reservoir who uses the water from it only on his own land has no such list which he can furnish. It is doubtful that the legislature intended to interfere in cases in which an owner of a small reservoir wants to put it to use only on his own lands. But conceding that such owner may sever his reservoir rights from his own lands, yet if he fails to do so and conveys his lands with its appurtenances without reserving his reservoir rights which are ap-

purtenant to his land—they were made so in this case by the Certificate of Appropriation in 1910—and such owner does not in fact convey them to someone else or puts the reservoir to use on other lands, as appears to be true in this case, then we see no sound reason why the reservoir rights should be left in mid-air and should not pass with the conveyance of his own land. It would seem that in such case there is an implied intention to that effect, since the statute requires that water should be put to a beneficial use. This court held in the early case of Frank v. Hicks, 4 Wyo. 502, 35 P. 475; and McPhail v. Forney, 4 Wyo. 556, 35 P. 773, that water rights appurtenant to land pass with the conveyance of the land. Frank v. Hicks, supra, was approved in the Colorado case of Gelwicks v. Todd, 24 Colo. 494, 52 P. 788. Child v. Whitman, 7 Colo. App. 117, 42 P. 601, cited to us by counsel for plaintiffs and which seems to hold the contrary, does not seem accurately to represent the law of Colorado. See Long on Irrigation, 2nd Ed., P. 316, note 23, and King v. Ackroyd, 28 Colo. 488, 66 P. 906. We perceive no impelling reason why we should depart from our early holding as above mentioned further than necessary. The circumstances in this case seem to require that we apply it, particularly since "appurtenances" seem to have been conveyed in the deed to Brooks.

If, however, we should be mistaken in what we have said, then we should bear in mind in this case that no no other party lays claim to the reservoir in question here. Plaintiffs for many years—ten years according to Sturgeon's testimony—recognized that defendants owned it. That fact does not appear in any case cited by counsel for plaintiffs. It is now rather late to contend that someone else—some mythical person—might claim it. Even if that remote possibility appeared, it would be a matter of concern for defendants and not

for the plaintiffs, unless perchance the reservoir had been abandoned as plaintiffs claim, a matter to be discussed presently.

3. Non-users and Abandonment of Water.

There seems to have been some doubt in the minds of the court and of counsel as to whether or not this action is an action for forfeiture of the nature heretofore required by the decision of this court. Plaintiffs, in their prayer, did not ask the court to declare the rights of defendants forfeited. However, the question of abandonment and non-user has been discussed in the briefs of both parties herein, so that it seems somewhat difficult to avoid deciding it. As we view it, that is the really important point to be decided herein. After a most diligent search, we have not found any case at all similar to the facts in the case at bar. To sustain the judgment of the trial court, our decision herein must go one step farther than our previous pronouncements. The fact of the long continued disuse of the M G Reservoir has caused us considerable difficulty in reaching a conclusion herein.

Section 71-701, Wyoming Compiled Statutes 1945, provides in part:

"* * * in case the owner or owners of any such ditch, canal or reservoir shall fail to use the water therefrom for irrigation or other beneficial purposes during any five (5) successive years, they shall be considered as having abandoned the same, and shall forfeit all water rights, easements and privileges, appurtenant thereto, * * *."

It is contended by plaintiffs that such non-user automatically results in the forfeiture of the water rights. We have, however, held the contrary. Horse Creek Conservation Dist. v. Lincoln Land Co., 54 Wyo. 320,

92 P.2d 572, 576, 579, 580. We held therein that it could not be conceded that all that need be shown is the non-user for the statutory period of time or that the forfeiture automatically follows the failure to use the water right. And we further stated: "We are also inclined to the view that before the forfeiture of vested water rights provided for by Section 122-421 (§ 71-701) should be construed to be operative, there should be a formal declaration thereof procured by some one clothed by law with proper authority to invoke it. * * * It is quite obvious, too, that until a declaration of forfeiture has been made the owner of the water right still retains the title to it and is justified, of course, in his continued use thereof." The defendants in this case, accordingly, still have the unimpaired title to the M G Reservoir rights. Plaintiffs did not acquire any rights prior to the rights of defendants when they constructed their two reservoirs, and cannot acquire such priority rights unless and until the reservoir rights of defendants are declared abandoned. So the question herein remains as to whether or not the rights of defendants should under the circumstances herein be declared by us to have been abandoned. We did not, in the foregoing case, decide when a proceeding or action of forfeiture may be or must be commenced in order to deprive the owner of his rights, except that we held that if the water not used for a period of five years is, however, used for ten years prior to the action of forfeiture, the action for such forfeiture can no longer be brought. So we must fall back on general principles. Abandonment and forfeiture are not favored. Zezi v. Lightfoot, 57 Idaho 707, 68 P.2d 50; Wagoner v. Jeffery, 66 Idaho 455, 162 P.2d 400. It was said in Cowman v. Phillips Petroleum Co., 142 Kan. 762, 51 P.2d 988, 990; "Forfeitures must be promptly asserted. If not asserted, they are waived." And in Templing v. Bennett, 156 Kan. 68, 131 P.2d 904, 907, involving forfeiture

of an ordinary mineral right, the court said: "In a multitude of instances and in a great variety of circumstances, this court has applied the familiar rule of equity that a right of forfeiture must be promptly asserted or it will be treated as waived." We might say at this point, plaintiff Sturgeon testified that he acquired the land on which the reservoir in question is located in 1936 or 1937. The reservoir rights in question here had not been put in use for five years previously and were not put to use until 1951 or 1952. Yet he waited sixteen or seventeen years before bringing an action of forfeiture, and that after the defendant Brooks had twice repaired the reservoir and had recommenced to use the water. The testimony does not disclose the outlay, but judging from the fact that plaintiff Sturgeon had offered to contribute $500 to the repair of the dam of the reservoir, the expenditure by Brooks must have been at least substantial. Waiting sixteen or seventeen years to bring an action for forfeiture would, on its face, seem to be unreasonable time, especially in view of the facts just stated. It may be conceded herein for the purpose of this case, that if the action for forfeiture had been brought before Brooks put the reservoir again into use, the court would have been justified, if not constrained, to declare a forfeiture. But unfortunately for the plaintiffs, that was not done.

Another factor must be considered in determining the over-all equities between the parties herein. We have set out in some detail the conduct of the parties as between themselves. There can scarcely by any doubt that commencing at least with about 1946 or 1947 — or earlier, according to Sturgeon's testimony— Sturgeon acknowledged, recognized and acquiesced in the fact that Brooks owned the reservoir and the prior rights therein and that he had the privilege to

repair it, and use the water thereafter. It is stated in 31 C.J.S. § 125, . 393, 394: "If * * * in a course of dealing the title of one party or the other to the property involved in the transaction is recognized, and the dealing proceeds on that basis, both parties are ordinarily estopped to deny that title or to assert anything in derogation of it." We need not decide and do not say that such recognition and acquiescence alone can nullify our five-year statute of non-user, but when taken in conjunction with the fact that during the time of such recognition and acquiescence, Brooks, the defendant, twice repaired the reservoir at a substantial outlay and put the water stored therein to beneficial use, and in view of the fact that forfeitures are not favored and should be promptly asserted, it is difficult to perceive that Brooks would be dealt with equitably by now holding that his rights were forfeited.

It is held in Application of Boyer, 73 Idaho 152, 248 P.2d 540, 544, that an appropriator may resume the use of abandoned water at any time prior to the claim of right by a third party. That is similar to the rule applying in the case of adverse possession of property. Thus it is said in 2 C.J.S. § 56, 574, that: "It is generally held that mere possession, however long continued, is not adverse where the possession is without claim of right, title, or ownership * * *." In this case Brooks, the defendant, claimed priority of the waters of Duck Creek, adversely against everybody by reason of and to the extent of his reservoir rights dating back to 1902. The plaintiff Sturgeon did not dispute that priority right but conceded it. The appropriation which the latter made logically can hardly be a better one than is co-extensive with his claim of right—in this case to the waters of Duck Creek in connection with his reservoirs, after the rights of the M G Reservoir have been satisfied—unless public policy under the

five-year statute of non-user requires us to hold otherwise. We hardly think it does, unless perchance, plaintiffs had brought an action of forfeiture promptly after initiating their own rights, and the M G Reservoir had not been repaired and the waters therein had not been put to beneficial use before bringing the action.

Of course, it is altogether probable that both plaintiffs and defendants did not know the law. Counsel for plaintiffs probably were not advised of the preceding conduct of the parties, so that they can hardly be blamed for instituting the action herein. Had plaintiffs known the law, they would probably not have recognized any rights in the defendants after initiating their own rights, and would have brought this action much earlier. On the other hand, had the defendants known the law, they probably would have repaired the dam of their reservoir long before the plaintiffs initiated any rights in the waters of Duck Creek in connection with their reservoir and plaintiffs would have been in the same situation in which they now find themselves. But, of course, ignorance of the law does not excuse the parties. In short, we have searched in vain for any grounds by reason of which we could reverse the action of the trial court. We hesitate to say that public policy requires that we should construe our five-year statute of non-user so strictly as to deprive the defendants of the benefit of their labor, efforts and expenditures in 1951, 1952 and 1953. We come to this conclusion after much faltering in view of the possible loss or depreciation of the probable expenditures which the plaintiffs incurred, and in view of the fact that the long delay in repairing the dam of the M G Reservoir can hardly be said to deserve the approbation of the court.

4. Estoppel.

Plaintiffs claim the defendants are estopped to make any claims to the M G Reservoir. We have held that estoppel should be pleaded. McCarthy v. Union Pac. Ry. Co. 58 Wyo. 308, 328, 131 P.2d 326. The answer of the defendants, however, is far from a model answer to invoke the rules of law which are in their favor, so we have thought it best to ignore defects in the pleadings. Counsel for plaintiffs state that their clients spent $8,000 in constructing their reservoirs. We have searched the record in vain for testimony to that effect, though we may assume that Plaintiffs in fact spent a substantial sum of money. Counsel say that their clients constructed their reservoirs and incurred expenses on the strength of the fact that the rights to the M G Reservoir were abandoned. We are unable to follow this argument in the face of the testimony relating to recognition and acquiescence heretofore set out in detail and already discussed. Defendants in their answer say that plaintiffs are not harmed by maintaining the rights of defendants herein. The evidence does not show as to whether or not the flood waters of Duck Creek are sufficient to fill all the reservoirs in question here. If that is not so, and plaintiffs are in fact injured by our holding, they must lay that at the door of their tardy action and their conduct hereinbefore mentioned.

Some other, but minor matters are argued by counsel for plaintiffs but they are not meritorious.

The judgment of the trial court is affirmed.

*Affirmed.*

RINER, C. J., AND HARNSBERGER, J,, concur.