839 F.2d 1491
 15 Media L. Rep. 1138
 Arthur W. SILVESTER, Sr., The Fronton, Inc., a Florida
corporation, and Tourism and Development
Corporation, a Rhode Island corporation,
Plaintiffs-Appellants,
v.
AMERICAN BROADCASTING COMPANIES, INC., a New York
corporation, Geraldo Rivera, Hugh Downs, "John
Doe," and "Richard Roe", Defendants-Appellees.
 No. 87-5062.
 United States Court of Appeals, Eleventh Circuit.
 Eleventh circuit
 March 15, 1988.
 
 Ricci & Roberts, P.A., Gary W. Roberts, West Palm Beach, Fla., Stephen L. Dreyfuss, Hellring, Lindeman, Goldstein, Siegal, & Stearn, Newark, N.J., for plaintiffs-appellants.
 Donald M. Middlebrooks, Steel Hector & Davis, Thomas R. Julin, Miami, Fla., Michael J. Calvay, Coudert Bros., New York City, for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before JOHNSON and ANDERSON, Circuit Judges, and ATKINS*, Senior District Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 This case involves several libel claims stemming from a segment of ABC's "20/20" television program which dealt with allegations of corruption in the jai alai industry. We consider two primary issues in this appeal. First, are appellants Arthur Silvester, the Fronton, Inc., and Tourism and Development Corporation ("plaintiffs") limited public figures? Second, if so, did appellees American Broadcasting Companies, Inc., Hugh Downs, Geraldo Rivera, and Bernard Cohen ("defendants") act with actual malice in broadcasting the jai alai segment?
 
 I. BACKGROUND
 
 2
 The district court held that the plaintiffs were limited public figures and that the defendants did not act with actual malice. We affirm.
 
 
 3
 The factual background of this case is well articulated in the district court opinion. See Silvester v. American Broadcasting Companies, 650 F.Supp. 766 (S.D.Fla.1986). Briefly, this libel action stems from a segment of ABC's "20/20" program, broadcast on June 21, 1979, which focused on allegations of corruption in the American jai alai industry. The program first addressed a sophisticated gambling system called "systems betting" and raised allegations of illegal conspiracies among the systems betters, jai alai management, and jai alai players.[1] The segment then shifted its focus to the circumstances surrounding a fire which destroyed plaintiffs' Palm Beach fronton on December 26, 1978. Among the issues raised in the latter part of the broadcast were allegations of arson, insurance fraud, conspiracy, and potential links between the betting scandal and the fire as evidenced by the burial of a large number of the fronton's betting records shortly after the fire.
 
 
 4
 The district court identified three portions of the broadcast which could be interpreted as defamatory to the plaintiffs: the allegations of arson, fraud and conspiracy stemming from the Palm Beach fronton fire, the implicit linking of plaintiffs to the illegal betting and game fixing scandals, and the statements of Harvey Ziskis which implicitly linked the plaintiffs to illegal betting. See Silvester v. American Broadcasting Companies, 650 F.Supp. at 769-72, for a detailed description of the facts supporting its findings. In light of our holding for defendants on other grounds, we accept arguendo the district court's determination that these three aspects of the "20/20" segment were susceptible to defamatory interpretations.
 
 II. DISCUSSION
 
 5
 The test for determining liability in a defamation case turns on whether the libeled party is a public or private figure and on whether the defamatory publication addresses a public or private concern. If the injured party is a public figure or official and the defamatory material involves issues of legitimate public concern, the plaintiff must prove that the defendant acted with actual malice to establish liability. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Gertz v. Robert Welsh, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The actual malice test requires plaintiffs to show that defendants published the defamatory material with a "high degree of awareness of ... [its] probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).
 
 A. Matters of Public Concern
 
 6
 The defamatory speech in this case clearly addresses matters with which the public has a legitimate concern. The public is legitimately interested in all matters of corruption, particularly when the corruption involves gambling in a highly-regulated industry and the effects of the corruption could cost taxpayers and the many members of the general public who patronize the industry millions of dollars. Based on the "content, forum, and context ... as revealed by the whole record," we conclude that the defamatory speech here is a matter of public concern. Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749 at 761, 105 S.Ct. 2939 at 2947, 86 L.Ed.2d 593 (1985). See also Della-Donna v. Gore Newspapers Co., 489 So.2d 72, 76 (Fla.App. 4th Dist.1986) (publications addressing fiscal soundness and local control of university are matters of legitimate public concern); Rosanova v. Playboy Enterprises, Inc., 580 F.2d 859, 861 (5th Cir.1978) (article describing plaintiffs "reported associations and activities concerning organized crime are, without dispute, subjects of legitimate public concern."). Cf. Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (speech focusing on plaintiff's divorce involved inherently private concerns).
 
 B. Limited Public Figures
 
 7
 We next turn to the question of whether plaintiffs were public figures. In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court discussed at length the distinction between private and public figures. The Court noted two fundamental differences between public and private figures. First, public figures usually have greater access to the media which gives them "a more realistic opportunity to counteract false statements than private individuals normally enjoy." Id. at 344, 94 S.Ct. at 3009; see also Hutchinson v. Proxmire, 443 U.S. 111, 136, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) ("Regular and continuing access to the media ... is one of the accouterments of having become a public figure.").
 
 
 8
 Second, and more importantly, "public figures ... voluntarily expose themselves to increased risk of injury from defamatory falsehoods concerning them." Id. at 345, 94 S.Ct. at 3010. In short, public figures "invite attention and comment." Id. See also Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1292 (D.C.Cir.1980) ("[Plaintiffs] thus accept the risk that the press, in fulfilling its role of reporting, analyzing, and commenting on well-known persons and public controversies, will focus on them and, perhaps, cast them in an unfavorable light.")
 
 
 9
 We conclude that the plaintiffs met the two basic Gertz criteria which distinguish public figures from private figures. The plaintiffs, particularly Arthur Silvester, had ready access to the media for many years prior to the 1979 broadcast and they voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment.
 
 
 10
 In Gertz, the Supreme Court explained that there are two types of public figures:
 
 
 11
 Some [plaintiffs] occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.
 
 
 12
 418 U.S. at 345, 94 S.Ct. at 3009. This latter type of plaintiff is known as a limited public figure. The defendants do not contend that the plaintiffs in this case are all-purpose public figures. Consequently, we must determine whether the district court was correct in holding that the plaintiffs were public figures for the limited purpose of issues concerning the Jai Alai industry.
 
 
 13
 The proper standards for determining whether plaintiffs are limited public figures are best set forth in Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C.Cir.1980), upon which the district court relied extensively.[2] Under the Waldbaum analysis, the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether "the alleged defamation [was] germane to the plaintiffs' participation in the controversy." Id. at 1297.
 
 
 14
 Under the first prong of the Waldbaum test, a public controversy must be more than merely newsworthy. Id. at 1296; Wolston v. Readers Digest Association, Inc., 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979) ("The private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."). In addition, the public controversy must not be an essentially private concern such as divorce. Time, Inc. v. Firestone, 424 U.S. 448, 454-55, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). If it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern. Waldbaum, 627 F.2d at 1296. In short, as the court stated in Waldbaum, "[i]f the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." Id. at 1297.
 
 
 15
 The public controversy in this case is corruption in the jai alai industry. The major facet of the public controversy is the allegation of illegal cooperation and alliance between jai alai players, management, and professional "systems betters." Another aspect of the controversy is the Palm Beach fronton fire, which resulted in the loss of many betting records. Associated with the Palm Beach fire is the unauthorized burial of many other important fronton records shortly after the fire. The loss of records, whether permanent or temporary, greatly hindered law enforcement agencies' investigation of alleged improprieties involving systems betters and jai alai management.
 
 
 16
 It is clear that the public controversy preexisted the "20/20" broadcast and that the issues addressed in the broadcast were being discussed in a public forum prior to the "20/20" show. For example, defendants submitted to the district court numerous articles published prior to the June 21, 1979, broadcast date which addressed various aspects of corruption in the jai alai business. The articles ranged from columns in the local Palm Beach and Newport papers to feature stories in the Wall Street Journal, New York Times, Sports Illustrated, and Miami Herald, among others.
 
 
 17
 In addition, official state investigations of the jai alai industry were initiated prior to the broadcast in each state in which jai alai is played. In Rhode Island, for example, the State Athletic and Racing Commission initiated investigation and subsequently asked the state police to assist them in their investigation. Similarly, in Florida, the Parimutuel Betting Division of the State Revenue Department commenced an investigation in early 1979 following the fronton fire. Also, grand jury probes into aspects of jai alai corruption were underway prior to the "20/20" broadcast.
 
 
 18
 The public nature of the controversy is underscored by the highly regulated nature of the jai alai industry. Extensive state regulation of jai alai exists in all states in which the sport is played. The primary purpose of the regulations is to supervise the gambling mechanism which is a crucial aspect of jai alai. In addition, the regulations ensure that the state receives its authorized share of gambling revenue.[3] Consequently, the public has a marked interest in a controversy that involves alleged violations of important state regulations. See Reliance Insurance Co. v. Barron's, 442 F.Supp. 1341, 1348-49 (S.D.N.Y.1977) (one factor supporting district court's conclusion that plaintiff insurance company was a public figure was that plaintiff was subject to close state regulation).
 
 
 19
 The potential loss of tax revenue because of corruption also is evidence that resolution of the controversy could affect many others besides the systems betters, players, and jai alai management and owners who are directly involved or participants in the controversy. Corruption in the industry also affects the hundreds of thousands of citizens who patronize jai alai frontons each year.
 
 
 20
 The plaintiffs correctly point out that many of the newspaper articles presented by the defendants as exhibits predate and are unrelated to the betting scandal. These articles, however, highlight plaintiffs' longstanding access to the media. As early as 1972, Arthur Silvester received opportunities to voice his opinions to reporters covering his Palm Beach and later his Newport frontons. Gertz and its progeny clearly state that relative ease of access to the media is one of two factors by which public and private figures can be distinguished from each other.
 
 
 21
 The plaintiffs also argue that the defendants created their own defense by unilaterally making the plaintiffs into public figures. Plaintiffs assert that the jai alai "scandal" was nothing more than a "press-created 'controversy' " which under Wolston v. Readers Digest Association, Inc., 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), and Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), is insufficient to establish a defense in a libel case. The plaintiffs' interpretation of Wolston and Hutchinson is erroneous. These cases stand for the proposition that the press entity which publishes the defamatory material cannot make a previously private individual into a public figure merely by flooding the public with many articles about the plaintiff. The essence of these cases is that the plaintiff must have been a public figure prior to the publication of the particular defamatory speech which is the issue of the litigation.
 
 
 22
 For example, in Hutchinson v. Proxmire, the plaintiff sued Sen. Proxmire for defamation related to Proxmire's presentation of his "Golden Fleece Award" to the plaintiff. Prior to his receipt of the award, plaintiff had received minimal attention from the press. He had no more access to the media than an ordinary citizen until the press sought his comment upon his receipt of the award. It was Sen. Proxmire's award that gave the plaintiff access to the media and the court concluded that a defamation defendant cannot create his own defense in this manner.
 
 
 23
 The plaintiffs in this case attempt to lump the ABC defendants with all other members of the media. Their contention is that the press created the public controversy evidenced by the many newspaper articles, that ABC is part of the press, and that therefore the defendants manufactured their own defense by creating the public controversy. It is clear that ABC had nothing to do with the articles published prior to its broadcast. Furthermore, the former Fifth Circuit held that it is incorrect in a defamation case to "examine the bona fides of the media-universal as a monolithic, nonpresent defendant, represented by [defendant] in this case." Rosanova v. Playboy Enterprises, Inc., 580 F.2d at 861. Consequently, plaintiffs cannot successfully contend that the defendant, as a representative member of the press, created its own defense.[4]
 
 
 24
 The second prong of the Waldbaum limited public figure analysis addresses the extent to which the plaintiffs are involved in the public controversy. It is clear that the plaintiffs must be more than tangential participants in the controversy. Waldbaum, 627 F.2d at 1297. To fulfill the second prong, the plaintiff either (1) must "purposely [try] to influence the outcome" of the public controversy, or (2) "could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." Id.
 
 
 25
 In general, public figures voluntarily put themselves into a position to influence the outcome of the controversy. Gertz v. Robert Welch, Inc., 418 U.S. at 345, 94 S.Ct. at 3009. However, "occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome. Unless he rejects any role in the debate, he too has 'invited comment' relating to the issue at hand." Waldbaum, 627 F.2d at 1298. As the Former Fifth Circuit noted in Rosanova v. Playboy Enterprises, Inc., 580 F.2d at 861, "[i]t is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be. It is sufficient, ... that '[defendant] voluntarily engaged in a course that was bound to invite attention and comment.' "
 
 
 26
 Here, plaintiffs were intimately involved in the public controversy. For example, plaintiff Tourism and Development Company, Inc., of which plaintiff Arthur Silvester was the principal shareholder, owned the only jai alai fronton in Rhode Island. Because there were no other Rhode Island frontons, it is unquestionably true that the fronton and its management were the sole focus of the official investigations and journalistic probes of jai alai corruption in Rhode Island. In Florida, plaintiffs owned one of ten frontons in the state. Much of the Florida investigations focused on the Palm Beach fronton after it became apparent that arson was the cause of the fronton fire and that many of the fronton's betting records had been buried shortly after the fire under orders from the fronton's management, including plaintiff Silvester.
 
 
 27
 Because the plaintiffs held positions of prominence in an industry with a very limited number of major figures, they were in a position to influence the resolution of the controversy over corruption in the jai alai industry. Plaintiffs initially thrust themselves into this position of prominence by voluntarily entering a strictly regulated, high-profile industry in which there were few major participants. By becoming important members of the regulated jai alai industry, they invited public scrutiny, discussions, and criticism.
 
 
 28
 Plaintiff Arthur Silvester also thrust himself to the forefront of the controversy in an attempt to influence its outcome in several specific instances. For example, as the principal shareholder of the only fronton in Rhode Island, he appeared before the Rhode Island Gaming Commission during its investigation of corruption in the systems betting operations at the fronton and testified that he thought that systems betters should receive preferential treatment at the fronton. This clearly was a controversial statement.
 
 
 29
 With regard to the Palm Beach fronton fire, Silvester stepped to the forefront of this aspect of the controversy by being the first to allege that arson was the source of the fire. He made these allegations directly to the media and received much press coverage with regard to these allegations. He also maintained the spotlight on the fire and his connection to it by offering a $25,000 reward for information leading to the arrest of the arsonist. Although Silvester declined to give interviews after it was publicly revealed that many of the fronton's betting records had been buried shortly after the fire, he continued to be the focus of public attention with respect to this facet of the corruption controversy. This is evidenced by the official state investigation of the record burial, which resulted in an order to show cause why the plaintiffs should not lose the fronton operating licenses. This order was issued just prior to the "20/20" broadcast. Even after Silvester stopped speaking to the press, many media articles were published about the fire, the arson investigation, and the burial of the records.
 
 
 30
 Finally, it is self-evident that the defamatory parts of the "20/20" broadcast were germane to the plaintiffs' participation in the controversy as is required under the third prong of the Waldbaum analysis. The primary concern of the "20/20" segment was the alleged corruption in the jai alai industry and the plaintiffs' role in it. See Silvester v. American Broadcasting Companies, 650 F.Supp. at 781-85 (transcript of the "20/20" broadcast).
 
 
 31
 In summary, we conclude that all three prongs of the Waldbaum test are satisfied and that the plaintiffs are limited public figures. First, there was a valid public controversy involving corruption in the jai alai industry. Specifically, the controversy centered on the tainted role of systems betters and on possible connections between the arson which destroyed the Palm Beach fronton, the burial of betting records which were essential to an investigation of the systems betting scandal, and plaintiffs' connections to these events. The controversy was of legitimate public concern and affected the general public because of the highly regulated nature of the industry, the large amounts of state revenues potentially affected by corruption in the industry, and the large numbers of the general public that frequent jai alai frontons.
 
 
 32
 Second, the plaintiffs were in a position to "invite attention and comment" with respect to their participation in the controversy. Plaintiffs were prominent members of the industry, and because they were the primary or sole focus of certain aspects of the controversy, they were in a position to influence its outcome. Defendants presented numerous articles quoting Silvester, which establishes that the plaintiffs had long had ready access to the media. Also, Silvester's comments on the role of systems betters to the Rhode Island gaming commission, his offer of a reward for information about the arsonist who burned down the Palm Beach fronton, and his immediate and public assertion that the fire was caused by arson are specific ways in which he voluntarily thrust himself to the front of the controversy in an attempt to influence the public's view on the issue and to arouse their sympathy to his position.
 
 
 33
 Finally, we hold that the defamatory broadcast was germane to plaintiff's participation in the controversy.
 
 C. Actual Malice
 
 34
 Given our decision that the plaintiffs are limited public figures, the plaintiffs must present clear and convincing evidence that the defendants acted with actual malice to defeat defendants' summary judgment motion. Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). We affirm the district court's decision that plaintiffs failed to present clear and convincing evidence of actual malice.
 
 
 35
 The actual malice standard applied in libel cases was defined by the Supreme Court in New York Times Co. v. Sullivan, 376 U.S. at 279-80, 84 S.Ct. at 726-27. To show that defendants acted with actual malice by publishing defamatory material, a libel plaintiff must show that the defendant acted "with knowledge that it was false or with reckless disregard of whether it was false or not." As the district court noted in its opinion, "knowledge of falsity is self-explanatory." Silvester v. American Broadcasting Companies, Inc., 650 F.Supp. at 777. The determination of whether defendants acted with reckless disregard is subjective and requires the plaintiff to show that "the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).
 
 
 36
 The plaintiffs' most substantial allegation of actual malice concerns the use of statements made by Harvey Ziskis. Ziskis was a former fronton employee and a disenfranchised systems better who participated extensively in investigations conducted by journalists and law enforcement agencies into the reports of corruption in the systems betting activities at jai alai frontons. The plaintiffs presented affidavits of two law enforcement officers who stated that Ziskis was unreliable as a source of accurate information. The plaintiffs contend that, at a minimum, the defendants should have aired these criticisms of Ziskis as part of the "20/20" program and that the defendants should not have relied on him as such a crucial source of information for the show.[5] We conclude, however, as did the district court, that ABC included adequate footage in the broadcast to inform the viewing audience that Ziskis was not an unimpeachable source of information. As the district court explained, the broadcast presented Ziskis "as a man with an axe to grind...." 650 F.Supp. at 778. In addition, ABC performed a thorough, independent verification of Ziskis' information by interviewing numerous law enforcement officials, journalists, and Ziskis' attorney, all of whom were familiar with the jai alai controversy, Ziskis, or both.
 
 
 37
 We conclude that the rest of the plaintiffs' claims of actual malice are without merit and warrant little discussion. As the district court explained:
 
 
 38
 Defendants have proffered evidence that the jai alai segment was thoroughly researched through interviews with experts, including various law enforcement authorities who were investigating jai alai. Additionally, other news media who were investigating jai alai came up with much of the same allegations and support, which serves to corroborate defendants' findings. If the broadcast can be interpreted as accusing plaintiffs of arson and involvement in illegal gambling activities, there is no evidence that defendants doubted the truth of these charges or any other part of the "20/20" broadcast.
 
 650 F.Supp. at 778.[6]
 
 39
 For the foregoing reasons, the judgment of the district court is
 
 
 40
 AFFIRMED.
 
 
 
 *
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Plaintiff Tourism and Development Corporation owned the only fronton in Rhode Island and plaintiff The Fronton, Inc. owned a fronton in Palm Beach, Florida. Plaintiff Arthur Silvester was the principal stockholder in each of these companies. The defendants in this case are American Broadcasting Companies, Hugh Downs, who introduced the 20/20 segment, Geraldo Rivera, who reported and co-wrote the segment, and Bernard Cohen, who produced and co-wrote the segment
 
 
 [2]
 The district court also relied on Della-Donna v. Gore Newspapers Co., 489 So.2d 72, 76 (Fla.App. 4th D.C.A.1986), review denied, 494 So.2d 1150 (Fla.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987). Della-Donna set forth a similar standard: "We must first identify a 'public controversy' and secondly inquire into the nature and extent of the plaintiff's participation in that controversy."
 
 
 [3]
 This revenue is substantial and, by itself, is an important reason for the public to have legitimate concern with corruption in the Jai Alai industry which threatens this source of revenue. In Rhode Island, for example, the single fronton owned and managed by plaintiffs produced over one and a half million tax dollars for the state and $200,000 for Newport in 1978
 
 
 [4]
 In any event, plaintiffs' argument that the press created its own defense fails to diffuse the impact of the law enforcement investigations which are a major aspect of the controversy
 
 
 [5]
 ABC actually hired Ziskis as a consultant for the "20/20" jai alai segment. They paid him a total of $3,000, plus expenses
 
 
 [6]
 The district court did not err in declining to rule on plaintiffs' motions to compel discovery. There is no genuine issue of fact as to the role of ABC inhouse attorney Sam Antar. There was no limitation on discovery with respect to the question of Antar's role. It is clear that Antar acted only as a lawyer--not as an editor--in conjunction with the preparation of the "20/20" jai alai segment. His communications with ABC's editorial employees, including the defendants in this case, and his pre-broadcast notes and work product therefore are protected by the attorney/client privilege