2004 WY 128

Kenneth MARTIN, Appellant (Plaintiff),

v.

The COMMITTEE FOR HONESTY AND JUSTICE AT STAR VALLEY RANCH; and Dick Black, Jim A. Ross, Duane Johnston, Steve Crittenden, and Tom Baker, Appellees (Defendants).

No. 03–196.

Supreme Court of Wyoming.

Nov. 1, 2004.

Representing Appellant: Kenneth Cohen, Jackson, Wyoming.

Representing Appellees: Laurence W. Stinson of Bonner Stinson, P.C., Powell, Wyoming, for appellees Duane Johnston and Tom Baker; and James E. Phillips of James E. Phillips, P.C., Evanston, Wyoming, for appellee Jim A. Ross.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] This dispute arose out of a controversy in the Star Valley Ranch subdivision that resulted in the termination of the employment of the subdivision's general manager. Jim Ross, Dick Black, Duane Johnston, and Tom Baker (collectively the Defendants) published and distributed throughout the subdivision several bulletins critical of Kenneth Martin's alleged role in that controversy and advocating for his recall from his position as a director on the board of the Star Valley Ranch. Association (SVRA). Martin filed suit against the Defendants alleging that various statements in the bulletins were defamatory. The district court granted motions for summary judgment filed by the Defendants concluding that Martin was a public figure for the limited purpose of the controversy, and that he could not establish that the Defendants had acted with actual malice in publishing the bulletins. Martin appeals both findings. We will affirm.

### ISSUES

[¶ 2] In his brief, Martin sets out two issues:

Did the district court err in finding that Ken Martin was a limited purpose public figure?

Did the district court err in deciding on summary judgment that none of the Defendants acted with "actual malice" in publishing defamatory statements about Plaintiff?

Defendant Ross responds by setting forth three issues:

Issue No. 1: Did the District Court err in finding that Kenneth Martin ... was a public figure for a limited purpose?

Issue No. 2: Did the District Court err in finding that Martin could not establish by convincing clarity that Jim A. Ross ... acted with malice, even if Martin could show that Ross' statements were false or inaccurate?

Issue No. 3: Did the District Court err in granting summary judgment to Ross?

Defendants Johnston and Baker set out five issues for consideration:

1. Whether the District Court properly held that the Appellant [Martin] was a limited-purpose public figure.
2. Whether the District Court properly held that the facts were insufficient to establish that the subject publications were published with actual malice.
3. Whether the factual allegations of the complained-of publications are substantially true.
4. Whether the Committee for Honesty and Justice in Star Valley Ranch is a Wyoming Unincorporated Nonprofit Association and, therefore, a distinct entity with which its members are not co-principals.
5. Whether the undisputed facts are sufficient to support libel claims against Appellees Duane Johnston and Tom Baker.

## FACTS

[¶ 3] Star Valley Ranch is a residential development located in Lincoln County, Wyoming, consisting of about two thousand lot owners. Martin is a resident and lot owner in Star Valley Ranch, as are all of the Defendants. The subdivision is managed by the SVRA, a non-profit homeowners association. A seven-member board of directors, elected by the lot owners, governs the SVRA. The day-to-day operations of the SVRA are run by a general manager, who is hired by and serves at the pleasure of the board of directors.

[¶ 4] Kenneth Martin and Steve Crittenden were acquaintances who had played in a local band together. In June of 1999, they were elected to the SVRA board of directors. The general manager of the SVRA resigned in December of 1999. At Martin's suggestion, Crittenden was appointed to an interim position—business agent—to run the day-to-day operations until the board could complete a search for a new general manager. In March of 2000, the board decided to per-

manently hire Crittenden as the general manager.

[¶ 5] Martin did not concur with the decision because he believed that Crittenden was not qualified for the job. Several allegations of impropriety were made against Crittenden, including an accusation of sexual harassment against him by an SVRA employee. Martin and another board member were disturbed by the allegations against Crittenden. They hired an attorney who composed a letter to the board outlining their concerns about Crittenden and requested an opportunity to address the board. The board subsequently allowed Crittenden, the attorney who was retained by Martin and the other board member, and the employee who had made the allegations, to address the board in a series of open public meetings. A week after the last meeting, a new board election was held and three new directors were elected. In their first meeting, the new board passed a resolution recommending termination of Crittenden from the general manager's position. Crittenden was removed from the position shortly thereafter.

[¶ 6] In the aftermath of the controversy surrounding Crittenden's dismissal, the Defendants formed an informal committee to counter what they perceived as "dirty politics" on behalf of certain board members, particularly Martin. They called themselves "The Committee for Truth and Justice at Star Valley Ranch." The Defendants prepared six bulletins critical of Martin and distributed them to Ranch residents through the mail and by posting them in public areas. In the bulletins, the Defendants criticized Martin's role in Crittenden's firing and questioned his motivations.[1] They also advocated a recall of Martin and reinstatement of Crittenden as general manager.

[¶ 7] On February 19, 2002, Martin filed a complaint against the Defendants asserting that the bulletins contained defamatory statements and seeking actual and punitive damages. The Defendants moved for summary judgment, which was granted. The district court concluded that Martin was

---

1. The bulletins are reproduced in the appendix at the end of this opinion.

a limited purpose public figure because he had voluntarily injected himself into a public controversy. The court also found that "based on the affidavits and materials provided, that [Martin] could not establish by clear and convincing evidence that the Defendant acted with malice even if [Martin could] show that the Defendant's statements were false or inaccurate." Martin has appealed these rulings.[2]

## STANDARD OF REVIEW

[¶ 8] When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. *Reed v. Miles Land and Livestock Company*, 2001 WY 16, ¶ 9, 18 P.3d 1161, ¶ 9 (Wyo.2001). A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. *Scherer Construction, LLC v. Hedquist Construction, Inc.*, 2001 WY 23, ¶ 15, 18 P.3d 645, ¶ 15 (Wyo.2001); *Central Wyoming Medical Laboratory, LLC v. Medical Testing Lab, Inc.*, 2002 WY 47, ¶ 15, 43 P.3d 121, ¶ 15 (Wyo.2002).

*Burnham v. Coffinberry*, 2003 WY 109, ¶ 9, 76 P.3d 296, ¶ 9 (Wyo.2003). Questions of law are reviewed *de novo*.

**2.** The district court denied a motion by Martin to amend his complaint to add a claim of civil conspiracy. In addition to the district court's orders granting the Defendants' motions for summary judgment, Martin's notice of appeal states that he was appealing the denial of his motion to amend. However, Martin did not address this claim in his appellate brief. Accordingly, we

## DISCUSSION

### Public Figure

[¶ 9] The United States Supreme Court has held that the constitutional guarantees of free speech and press prohibit a public official from recovering damages for defamatory statements unless it can be shown that the statements were made with actual malice. *New York Times Company v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Three years later, the Court extended that protection to public figures. *Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, *rehearing denied*, 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967). Public figures are those who "have assumed roles of special prominence in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). There are two types of public figures: (1) individuals who have achieved such pervasive fame or notoriety that they are a public figure for all purposes and in all contexts;[3] and, more commonly, (2) individuals who have voluntarily injected themselves or been drawn into a particular public controversy and thereby becoming a public figure for a limited range of issues for which they are prominent. *Gertz*, 418 U.S. at 345, 351–52, 94 S.Ct. 2997; *Adams v. Frontier Broadcasting Company*, 555 P.2d 556, 560 (Wyo.1976). Pursuant to the limited public figure concept, only those statements relating to the controversy that give rise to an individual's public figure status receive the protection of the actual malice standard. *Arnold v. Taco Properties, Inc.*, 427 So.2d 216, 218 n. 7 (Fla.App. 1 Dist.1983). The defamatory statement itself cannot, of course, create a public controversy. *Hutchinson v. Proxmire*, 443 U.S. 111, 134–35, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

[¶ 10] The district court held that Martin was a public figure for the limited purpose of the controversy that was the subject of the

consider his appeal on the claim to be waived. *Ultra Resources, Inc. v. McMurry Energy Electric Company*, 2004 WY 121, 99 P.3d 959 (Wyo. 2004).

**3.** There is no question that Martin is not an all-purpose public figure.

alleged defamatory statements—Crittenden's termination from his job as general manager of the SVRA by the board of directors. Martin argues that the court's conclusion was in error for two reasons. First, he insists that there was no public controversy. He contends that the firing of Crittenden was simply an internal dispute within the confines of a private subdivision. He points out that there was no media coverage of the dispute over Crittenden's termination through local or regional newspapers. Martin concludes that absent such coverage in the media there can be no public controversy. Even if one could be said to exist, Martin claims it was created by the Defendants' publication of the bulletins. Second, if a public controversy does exist, Martin declares that his actions did not make him a public figure. Specifically, he argues that he was involuntarily drawn into the controversy surrounding Crittenden's employment by virtue of his position on the board of directors, and that he was simply carrying out his duties. Martin also notes that he did not seek any publicity during the controversy. For these reasons, Martin urges us to reverse the district court's finding that he was a limited purpose public figure.

■■■ [¶ 11] The first step in determining if a plaintiff is a public figure is to discern whether or not there is a public controversy.

> A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. *Time, Inc. v. Firestone,* 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 (1976). [Footnote omitted] Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.

*Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.1980); *Trotter v. Jack Anderson Enterprises, Inc.,* 818 F.2d 431, 433–34 (5th Cir.1987); *Silvester v. American Broadcasting Companies, Inc.,* 839 F.2d 1491, 1494 (11th Cir.1988); *Barry v. Time, Inc.,* 584 F.Supp. 1110, 1115–16 (N. Dist.Cal.1984). A public controversy "is a legal term of art; the term only encompasses a dispute 'that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.'" *Carr v. Forbes, Inc.,* 259 F.3d 273, 279 (4th Cir.2001) (citing *Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541, 1554 (4th Cir. 1994)); *see also Denny v. Mertz,* 100 Wis.2d 332, 302 N.W.2d 503, 507 (App.1981) ("A public controversy is a dispute having foreseeable and substantial ramifications for non-participants.").

■■ [¶ 12] There is no question that the dispute at issue here had ramifications for persons who were not direct participants in it. There are about two thousand lot owners in Star Valley Ranch. The SVRA, a non-profit homeowners association, manages Star Valley Ranch. The lot owners elect the board of directors of the SVRA, who, in turn, hire a general manager to run the day-to-day operations of the SVRA. Typically, the duties associated with the position of manager in a homeowner's association have a direct impact on the members of the association:

> *Community association managers* manage the common property and services of condominiums, cooperatives, and planned communities through their homeowners' or community associations.
>
> . . . .
>
> In community associations, although homeowners pay no rent and pay their own real estate taxes and mortgages, community association managers must collect association dues.
>
> . . . .
>
> In many respects, the work of community association managers parallels that of property managers. They collect monthly assessments, prepare financial statements and budgets, negotiate with contractors, and help to resolve complaints. In other respects, however, the work of these managers differs from that of other residential property and real estate managers. Community association managers interact on a daily basis with homeowners and other

residents, rather than with renters. Hired by the volunteer board of directors of the association, they administer the daily affairs, and oversee the maintenance of property and facilities that the homeowners own and use jointly through the association. They also assist the board and owners in complying with association and government rules and regulations.

Some associations encompass thousands of homes and employ their own onsite staff and managers. In addition to administering the associations' financial records and budget, managers may be responsible for the operation of community pools, golf courses, and community centers, and for the maintenance of landscaping and parking areas. Community association managers also may meet with the elected boards of directors to discuss and resolve legal issues or disputes that may affect the owners, as well as to review any proposed changes or improvements by homeowners to their properties, to make sure that they comply with community guidelines.

Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, 2004–05 Edition, Property, Real Estate,* and on the Internet at (*http://www.bls.gov/oco/ocos022.htm* ). The record does not describe the specific duties of the general manager of the SVRA. Nevertheless, whether or not those duties paralleled those set out in the Bureau of Labor Statistics handbook exactly, it is obvious that the general manager has a significant affect upon the lives of all of the lot owners in the subdivision: His duties require decisions on issues that not only affect the financial interests of the lot owners, but their very quality of life. For that reason, the outcome of the dispute over Crittenden's employment as general manager affected the lot owners in an appreciable way.

■ [¶ 13] The dispute at issue here was, at its essence, a political one. The members of the board of directors, including Martin, were elected by the lot owners to administer the entity created to maintain and manage their community. The directors are analogous to a city council, and the general manager is comparable to a city manager.

Entities that possess the characteristics of a governing body or are effectively the equivalent of such because they exercise traditional governmental functions ought to be regarded as the proper subjects of public controversies. Note, *Defining a Public Controversy in the Constitutional Law of Defamation,* 69 Va. L.Rev. 931, 964 (1983). The lot owners of Star Valley Ranch should have the same rights as the citizens of a municipality to criticize or comment upon the actions of their elected representatives. The entire purpose behind the adoption of the actual malice standard, along with the concepts of public officials and figures, is that there is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," and despite the occurrence of the inevitable erroneous statements in a free debate, such statements "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive.'" *New York Times Company,* 376 U.S. at 270–72, 84 S.Ct. 710 (omission in original).

■ [¶ 14] On a final note, we address two cases that Martin and the Defendants have cited in support of their positions. In *Smith v. A Pocono Country Place Property Owners Association, Inc.,* 686 F.Supp. 1053 (M.D.Pa.1987), the plaintiff was the general manager of the defendant Association, a residential property development containing approximately 2,500 property owners. The day after plaintiff was terminated from his position, the Association circulated a publication entitled "Pocono Country Place Special Issue Newsletter and Bulletin" to all of the property owners in the Association. Plaintiff sued alleging that the publication contained defamatory statements. One question facing the court was whether or not a public controversy existed. The dispute between the parties concerned the membership of the board of directors of the Association. In support of its position that the dispute was a public controversy, the Association cited coverage of the dispute by two local newspapers. The court concluded: ·

Concededly, while the controversy in question may not be of national or even state-wide importance, it is a public dispute of concern to residents of the local community, especially members of the Association. *See Lorain Journal Co. v. Milkovich,* 474 U.S. 953, 963, 106 S.Ct. 322, 88 L.Ed.2d 305 (1985) (Brennan, J., dissenting). In *Milkovich,* Justice Brennan with whom Justice Marshall joined in dissenting from the denial of *certiorari,* stated that a controversy involving a local high school wrestling coach was a public controversy of concern to residents of the local community, as important to them as larger events are to the nation. *Id.* 106 S.Ct. at 329, 106 S.Ct. 322. Justice Brennan found significant the fact that it was only in this community that the challenged article was circulated. *Id.* Similarly, in this case, the alleged defamatory material was published in newsletters specifically distributed to members of the Association. It is these Association members to whom the controversy involving the directorship is most prominent. Thus, as to the Association and the local community, the conflict over the proper directorship of the Association is a public controversy in that it affects a segment of the general public in an appreciable way.

*Smith,* 686 F.Supp. at 1058. Martin latches onto the fact that the dispute in *Smith* was covered in two local newspapers and argues that since there was no local news coverage of the dispute in this case, then there could be no public controversy. The problem with Martin's argument is that the court in *Smith* completely ignored the fact that newspapers had covered the quarrel when making its determination that the dispute was a public controversy. Instead, the court focused on the fact that the defamatory material was specifically prepared for and circulated to the segment of the population—the members of the Association—affected by the dispute. That is precisely the situation that is present here—the Defendants circulated their bulletins criticizing Martin's role in Crittenden's termination as general manager to the segment of the population—the lot owners in the SVRA—that were directly affected by the dispute. While media coverage may be a

relevant factor in determining that a particular dispute is a public controversy, it is not determinative. *Denny,* 302 N.W.2d at 507 n. 17 (citing *Waldbaum,* 627 F.2d at 1297). The decision in *Smith* supports our conclusion that the dispute in this case is a public controversy.

[¶ 15] The second case is *Sewell v. Eubanks,* 181 Ga.App. 545, 352 S.E.2d 802 (1987). Sewell distributed an allegedly libelous mailer to property owners in a resort community opposing Eubank's candidacy for re-election to the board of directors of the property owners association. The Georgia Court of Appeals concluded that the dispute was not a public controversy:

> It is uncontroverted that Bent Tree is a private residential development, access to which is controlled by lot ownership and payment of assessments. The record further reveals that the Association election did not involve the entire Bent Tree community, but only those Bent Tree property owners who were also members of the Association—some 600 of the 3,500 lot owners. We have found no case, and appellant has cited us to none, in which activity in such a limited, private organization constituted a "public controversy" in order to confer upon the individual the status of "public figure."

*Sewell,* 352 S.E.2d at 803. Martin again cites this case as support for the contention that the dispute in this case was not a public controversy. We do not find the Georgia decision persuasive. There is no analysis of what constitutes a public controversy largely because it appears that the appellant in that case did not present a sufficient argument to the court. The Georgia court also did not have the benefit of the *Smith* decision, which was decided eleven months later. We stand by our analysis and hold that the dispute at issue here was a public controversy.

[¶ 16] Martin claims that no public controversy over Crittenden's termination existed at the time the board of directors made its decision to fire him. Instead, he insists that the controversy arose only after the Defendants had published their bulletins. Martin points out that the defamatory statements cannot themselves create the public contro-

versy. *Hutchinson*, 443 U.S. at 134–35, 99 S.Ct. 2675. The record does not support Martin's argument. The question of Crittenden's employment was the subject of at least two public meetings of the board. Martin retained an attorney, who prepared a report for the board detailing allegations of sexual harassment against Crittenden. The attorney, Crittenden, and the alleged victim of the sexual harassment, all addressed the board during a public meeting. The board debated the matter, and a resolution was passed recommending Crittenden's termination. Clearly, there was a public debate over this issue in which various parties expressed opposing views. All of these events predate the publication of the bulletins. The publication of the bulletins did not create a public controversy, they only commented upon an existing one.

[¶ 17] The final question in the determination of Martin's status as a public or private figure is whether he voluntarily injected himself into the public controversy. Martin argues that he was involuntarily drawn into the controversy. He claims that his participation in the controversy was simply an unavoidable consequence of his position as a director. Martin's contention is without merit.

In general, public figures voluntarily put themselves into a position to influence the outcome of the controversy. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3009. However, "occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome. Unless he rejects any role in the debate, he too has 'invited comment' relating to the issue at hand." *Waldbaum*, 627 F.2d at 1298. As the Former Fifth Circuit noted in *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d at 861, "it is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be. It is sufficient, ... that ' * * *[plaintiff] [4] voluntarily engaged in a course that was bound to invite attention and comment.' " *Silvester*, 839 F.2d at 1496. There is no question that Martin voluntarily engaged in

conduct intended to influence the course of the public controversy. Martin made the decision to be a candidate for the board of directors, presumably with full knowledge of the duties attendant to the position. There is nothing to indicate that Martin's decision to pursue election to the board of directors was anything but a voluntary one. Once elected, Martin chose to involve himself in the dispute over Crittenden's employment: Martin hired an attorney to investigate the claims against Crittenden and to present the case for his termination to the full board. By his own admission, Martin was actively involved in the debate concerning Crittenden and his employment as general manager. Martin should have expected attention and comment by the people affected by this issue. "When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure." *McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3rd Cir.1985). Martin made a voluntary choice to assume a position that, because of its very nature, there was a high degree of probability that he would be required to participate in issues of concern to the lot owners of the subdivision. Martin must accept the consequences of that decision. The district court's ruling that Martin voluntarily injected himself into a public controversy is affirmed.

### Actual Malice

[¶ 18] When a public figure is involved, the actual malice standard for liability is invoked:

> A public figure who has been libeled by the publication of a false statement of fact on a matter of public concern will not prevail in proving defamation under the actual malice standard unless he proves with convincing clarity that the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*Davis v. Big Horn Basin Newspapers, Inc.*, 884 P.2d 979, 984 (Wyo.1994) (citing *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 912 (Wyo.1992)). The actual malice standard established by the United States Supreme Court in the *New*

---

4. *Silvester* incorrectly states [defendant].

*York Times* case is a subjective one that focuses on the defendant's state of mind:

> " 'knowledge of falsity' involves a *subjective* awareness of the falsity of the statements, and 'reckless disregard' involves sufficient evidence to permit an inference that the defendant must have, in fact, *subjectively* entertained serious doubts as to the truth of the statements." (emphasis in original).

*Oil, Chemical and Atomic Workers International Union v. Sinclair Oil Corporation,* 748 P.2d 283, 287 (Wyo.1987) (quoting *McMurry v. Howard Publications, Inc.,* 612 P.2d 14, 18 (Wyo.1980) (Rooney, J., specially concurring)).

> With respect to the standard of convincing clarity, it may be helpful to recognize in this case that that standard is a stringent one. It is greater than a mere preponderance of the evidence. It requires proof that is clear, precise and indubitable or unmistakable and free from serious and substantial doubt. It is that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.

*MacGuire v. Harriscope Broadcasting Company,* 612 P.2d 830, 839 (Wyo.1980). When applying these standards in the summary judgment context, we follow the same approach we use in any other summary judgment setting. *Davis,* 884 P.2d at 984.

[¶ 19] Even if we accept Martin's characterization of the statements in the bulletins, he fails to present any argument as to the Defendants' knowledge of their falsity. Our independent review of the record fails to disclose any evidence that the Defendants "entertained serious doubts as to the truth of the statements." Our conclusion in the *MacGuire* case is equally applicable to this one:

> We have examined the evidentiary material in the record before us, and like the trial court, we find the record to be devoid of evidence of knowledge by these appellees of the falsity of the information published even giving to that material the interpretation urged by the appellants. Indeed we do not find the appellants seriously arguing actual knowledge of falsity. Similarly even relying upon favorable inference we have been unable to discern in this record evidentiary material which could lead to a finding with the requisite convincing clarity that the appellees were aware of the probable falsity of any information which was published.

*MacGuire,* 612 P.2d at 839–40. The convincing clarity standard is high, indeed. Martin has failed to meet it.

### CONCLUSION

[¶ 20] The dispute at issue here was a public controversy because its resolution directly affected non-participants in an appreciable manner. Martin voluntarily and vigorously inserted himself into the controversy making him a public figure. Since Martin has failed to present any evidence of actual malice on the part of the Defendants, we affirm the district court's summary judgment orders.

### APPENDIX

# News Flash

Friday, July 13, 2001

The political scene at Star Valley Ranch is beginning to heat up.

A certified letter was mailed Friday, July 6, to Ken Martin, a director of the ranch, signed by 76 of his constituents. Ken has not accepted the mail as of Thursday, July 12. The letter contained a recommendation that he resign his position as a director based on behavior inconsistent with the responsibilities of a director of a nonprofit Wyoming corporation.

What will happen next? Keep an eye out for a report on this continuing saga of events.

Sponsored by the Committee for Honesty and Justice at Star
Valley Ranch
Dick Black, Chairman Jim A. Ross, Treasurer

EXHIBIT

*E1*

UPDATED
# News Flash

Thursday, July 19, 2001

The political scene at Star Valley Ranch is heating up.

A certified letter was mailed Friday, July 6, to Ken Martin, a director of the ranch, signed by 76 of his constituents. Ken has chosen to not accept the mail, and it was returned Wednesday, July 18. He has made it quite clear that he doesn't want to hear from any constituent who may not agree with him.

What will happen next? Keep an eye out for a report on this continuing saga of events.

Sponsored by the Committee for Honesty and Justice at
Star Valley Ranch
Dick Black, Chairman Jim A Ross, Treasurer

EXHIBIT
E2

571

### Ranch Information
from THE COMMITTEE FOR HONESTY AND JUSTICE at STAR VALLEY RANCH
CHAIRMAN: DICK BLACK TREASURER JIM A. ROSS Friday, July 27, 2001

## The History of Friction between Steve Crittenden and Ken Martin

The following information has been condensed to it's present form.

Back in the days when the Swingers band was beginning to receive money for playing at functions, the band decided to divide the money into two parts, 1/2 would be set aside for making band needed purchases, and the other 1/2 would be available to distribute to the players on a prorata basis. Steve Crittenden was to be the business manager, and Nancy Smith was to be the assistant business manager and both were to be signers on the checking account. Ken Martin was the only Ranch player to actually take a share after each performance, while the rest of the Ranch players left all of their shares in the account. One of the purchases for the band was some music books, at $50 a copy. The books were to be retained by Steve Crittenden, who would index them, and make a photo copy of the particular song desired by a band member. One evening Ken Martin called Steve and wanted the books. Steve said that he would be glad to give him a photo copy of whichever songs Ken wanted. Ken persisted that he wanted the books. Steve then told him that, if the band met and agreed, then he would give him the books. This brought on a tirade from Ken, and the acceleration of the friction between the two of them

The friction caused the band to dissolve because of the high stress level between Ken and particularly Steve. The band had approximately $1000 left in its checking account, so the band held a meeting, which Ken did not attend, and decided to donate it to the Star Valley Medical Center Foundation. Nancy Smith closed out the account and hand delivered a cashiers check to the Medical Center Foundation. Unfortunately, the check was misplaced and the right person at the Medical Center Foundation never received the check. Ken called the Medical Center one day and discovered that the check had not been received. He immediately accused Steve of using the money for his own purposes. When Nancy Smith became aware of the problem, she immediately stopped payment on the first check and hand carried a new one to the Foundation administrator.

This is an accurate summary of these happenings:

_____ _____ _____
Nancy Smith Duane Johnston Steve Crittenden

The next major problem between Ken and Steve occurred when Steve became General Manager. Ken came into the SVRA office one day and wanted some financial information. Steve told him, that, although he agreed that Directors should have access to financial information, SVRA bylaws (Article 1C, Section 2 under "Inspection of Corporate Records") said that members and directors must put their request for financial information in writing and submit it to the Board (this bylaw was changed by the Board at a later date). Ken launched another tirade, and began to spread the word that Steve was deliberately withholding financial information about the Ranch

**In each of these events, friction is caused because Steve Crittenden did not succumb to Ken Martin's demand for a special privilege.**

The next chapter will be even more interesting. Watch for it.

EXHIBIT
E3

---

# Ranch Information

### from THE COMMITTEE FOR HONESTY AND JUSTICE at STAR VALLEY RANCH

CHAIRMAN: DICK BLACK TREASURER. JIM A. ROSS MONDAY, AUGUST 8. 2001

---

## INFORMATION ABOUT THE ATTACK ON STEVE CRITTENDEN'S MORALS

Steve Crittenden and his family were having dinner at SVRA-member Kathleen Peterson's home with their minister, the reverend Cathy Harrison, the week before the March 2001 Board meeting. Kathleen's estranged husband, Bill Peterson, stopped by to pick up something. Kathleen asked Bill to describe to the Crittendens and Reverend Harrison the phone call he got from Ken Martin.

Bill said that Ken Martin had called him and introduced himself as a member of the SVRA Board of Directors. Ken wanted to know if Bill knew that Steve Crittenden was having an affair with his wife. Bill said that he had heard the rumor, but it was not true (the rumored affair never became an issue in the Peterson's subsequent divorce)

Clearly disappointed by Bill's response, Ken then ask if Bill had "any dirt on Steve". Bill said he did not. Ken then said to Bill, "If you think of anything before the Board meeting Saturday, call me."

This episode clearly illustrates Ken Martin's state of mind regarding Steve Crittenden, as well as Ken's eagerness to spread unfounded rumors. It represents an intrusion into Steve's marriage and an interference with Steve's ability to conduct his responsibilities as SVRA General Manager.

---

HERE IS A COPY OF THE AFFIDAVIT SIGNED BY HEATHER ERICKSON REGARDING THE SEXUAL HARASSMENT CHARGE BY KEN MARTIN.

Director Jim Chumley was present at all times during the preparation and signing of this affidavit. He verified to Sandy Thomas that there was no coercion of any kind placed on Heather to sign this document.

WATCH FOR THE NEXT ISSUE

THERE IS MORE TO COME!

### AFFIDAVIT

COMES NOW the deponent, Heather Erickson, and after being placed under oath, states and swears as follows:

1. My name is Heather Erickson, and I am an adult.

2. I was not ever sexually harassed by Steve Crittenden, SVRA General Manager.

3. Star Valley Ranch Association Directors Karen Drennon and Ken Martin took me out to dinner in an attempt to get me to sign an affidavit attesting to having been sexually harassed by Steve Crittenden, SVRA General Manager.

4. Ken Martin encouraged me to take legal action against the Star Valley Ranch Association.

SO STATED AND SWORN this _____ day of May, 2001

_Heather Erickson_

STATE OF WYOMING )
 )ss
COUNTY OF LINCOLN )

The foregoing instrument was subscribed and sworn to before me by

Heather Erickson this _____ day of May, 2001.

Witness my hand and official seal.

_Notary Public_

# Ranch Information

### from THE COMMITTEE FOR HONESTY AND JUSTICE at STAR VALLEY RANCH
### CHAIRMAN· DICK BLACK TREASURER: JIM A ROSS SATURDAY, AUGUST 18, 2001

## CONCLUSIONS

Our search for the truth about some events this past year lead the Committee to the following conclusions.

Ranch Director Ken Martin engaged in the unethical practice of making unfounded moral allegations against the Ranch General Manager, Steve Crittenden. These allegations resulted in the unjustified firing of Steve immediately after the last Directors election.

Director Ken Martin had two motivations for his unethical actions:

1. A personal grudge against Steve for Steve's refusal to grant Ken special privileges

2 To throw a cloud over the annual Director's election process by claiming mismanagement of the Ranch by the previous Board of Directors.

### CORRECTIVE ACTION

1. To help correct a major injustice. Steve Crittenden should be rehired for a term long enough for the new Board to evaluate his performance on the job.

2 Director Ken Martin should resign, or be removed from office by either the Directors, or by the membership of the Association.

DIRECTOR KARL KANNING has deliberately defied the decision by the Board that he must pay for playing golf. He was censured by the Board at a special Board meeting on Saturday, August 11, 2001. He walked out of that meeting and immediately proceeded to play golf without paying He has, in essence, abdicated his fiduciary responsibility to the Association as a Director. Director Ken Martin walked out of the same meeting

### CORRECTIVE ACTION

1 Director Karl Kanning should resign, or be removed from office by either the Directors, or by the membership of the Association

## CALL FOR ACTION

This Committee has decided to sponsor a petition for a recall election for both Ken Martin and Karl Kanning, to make sure that the Board knows it has the support of the membership To accomplish this successfully, there needs to be help from volunteers for:

1 Gathering signatures

2. Manhours to help make mailings and phone calls

3. Financial donations to cover printing and mailing costs

If you can help, contact Dick Black (883-4873), Jim A Ross (883-2848), or Tom Baker (883-2631

EXHIBIT

**E5**

If you would like to talk to someone about these recall petitions, call Dr. Richard Black at 307-883-4873, or any of these phone numbers:

| | | | |
|---|---|---|---|
| Tom Baker | 307-883-2631 | Sandy Thomas | 307-883-4897 |
| Jim A Ross | 307-883-2848 | Virginia Radford | 307-883-3330 |
| Liz Beck | 307-883-3034 | Jo Case | 307-883-4700 |
| Jim R Ross | 307-883-3001 | Bernie Mason | 307-883-2591 |
| Gene Felt | 307-883-2173 | Mary Hill | 307-883-3031 |

Committee for Honesty & Justice at Star Valley Ranch
P O Box 515, Thayne, WY 83127 Phone: 307-883-4873 E-mail: rblack@silverstar.com

Dear Star Valley Ranch Property Owner: August 30, 2001

A large number of SVR property owners who spend most, or all of their time at the Ranch, have been quite disturbed at the behavior of two of our directors, Ken Martin and Karl Kanning As a director, Ken Martin carried out a malicious attack on the morals of Ranch General Manager Steve Crittenden, which resulted in the firing of Steve the second day after the new directors were elected.

The Committee for Honesty and Justice was formed to find out the truth about Ken Martin's allegations and rumors. What the Committee found was evidence that Ken had deliberately begun a campaign to discredit Steve Crittenden on trumped up moral charges, as shown in the attached Ranch Information bulletins. Such behavior by a Star Valley Ranch Director in a Wyoming non-profit corporation is inexcusable, and certainly does not represent the integrity of the members of the Star Valley Ranch Association. That is the essence of the decision to request a recall election for Ken Martin.

After Karl Kanning was elected as a Director on a platform of "free golf", he proceeded to play golf without paying the fees required by the Association. He was reminded at an open Board meeting of the following legal position of the Association: Article V of the SVRA by-laws, as well as Article V of the DCC&Rs, in their descriptions of member's easements of enjoyment in the common property, clearly reserves the right of the Association to charge reasonable admission and other fees for the use of any recreational facility situated upon the Common Area. Neither of these guiding legal authorities can be altered by a "Hud" report or other literature produced by the developer, but only by the membership.

Karl Kanning continued trying to play golf without paying and was then censured by the Board in an open meeting, where Karl and Ken Martin's disruptive tactics were halted by Chairman Bill Martin. Both Ken and Karl got up and walked out of the meeting. Karl immediately proceeded to go play golf without paying, in a show of defiance to the Board. This man has abdicated his fiduciary responsibilty as a director of a Wyoming non-profit corporation, and should be removed from office.

We value your help as an owner. Directors are elected for the betterment of the Ranch, and not for their personal agenda We would appreciate your endorsement of these petitions and prompt return in the enclosed self-addressed and stamped envelope.