160 P.3d 1109 (2007)
2007 WY 94
James L. and Pamela H. BENTLEY, Appellants (Plaintiffs),
v.
DIRECTOR OF the OFFICE OF STATE LANDS AND INVESTMENTS; Lynne Boomgaarden, in her official capacity as Director of the Office of State Lands and Investments; Board of Land Commissioners; Governor Dave Freudenthal, Secretary of State Joseph B. Meyer, Auditor Max Maxfield, Treasurer Cynthia Lummis, and Superintendent of Public Instruction Jim McBride, in their official capacities as members of the Board of Land Commissioners; Wyoming Game and Fish Commission; Wyoming Game and Fish Department; and Terry Cleveland, in his official capacity as Director of the Wyoming Game and Fish Department, Appellees (Defendants).
No. 06-131.
Supreme Court of Wyoming.
June 8, 2007.
*1111 Representing Appellants: Karen Budd-Falen and Brandon L. Jensen, Budd-Falen Law Offices, LLC, Cheyenne, Wyoming. Argument by Mr. Jensen.
Representing Appellees: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Bridget Hill, Assistant Attorney General; C. Levi Martin, Senior Assistant Attorney General; Susan K. Stipe, Senior Assistant Attorney General. Argument by Mr. Martin and Ms. Stipe.
Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.
BURKE, Justice.
[¶ 1] In 1992, the State Board of Land Commissioners ("Board") began contemplating a sale of school lands in Carbon County where the Dome Rock Reservoir is located. In response to public concern that sale of the land would prevent public use of the reservoir for fishing purposes, the Board approved an easement in favor of the Wyoming Game and Fish Commission in 1993. The land was subsequently advertised for public auction subject to the easement. It was purchased by John Anselmi, who entered into an installment sales contract with the Board.
[¶ 2] In 2000, Mr. Anselmi assigned the sales contract to Appellants, James and *1112 Pamela Bentley. A short time later, the Game and Fish easement was recorded with the county clerk. In 2002, when the Bentleys made full payment under the sales contract, the State of Wyoming issued a patent conveying the land to them. The Bentleys initiated this action in 2004, seeking a declaration that the easement was void, injunctive relief, and damages. The district court upheld the validity of the easement and determined that the water rights appurtenant to the publicly auctioned land had also been transferred to Game and Fish.
[¶ 3] On appeal, the Bentleys contend that the district court erred in dismissing their claims and in granting summary judgment to Appellees. They assert the Game and Fish easement is invalid. They also claim ownership of the water rights associated with the property they acquired by assignment. We affirm.

ISSUES
[¶ 4] The Bentleys present the following issues for review:
1. Whether the Wyoming Board of Land Commissioners failed to convey a valid, and legally enforceable, easement to the Wyoming Game and Fish Commission on January 7, 1993?
2. Whether the Amortization Sales Contract conveyed immediate possession and equitable title to the Plaintiffs' successors-in-interest?
3. Whether the Patent issued to the Plaintiffs in 2002 relates back to the inception of title to the subject property, or June 3, 1993?
4. Whether the Plaintiffs purchased Section 16 without adequate notice of the easement?
5. Whether the Plaintiffs are the rightful owners of any and all water rights appurtenant to Section 16, including any water stored in the Dome Rock Reservoir (a.k.a. Indian Creek Reservoir)?
Appellees state the issues as follows:
1. Did the district court err when it dismissed appellants' causes of action relating to the Board of Land Commissioners' easement to the Wyoming Game and Fish Commission?
2. Did the district court err when it found that the water rights which were historically attached to Section 16 were severed by the easement and, therefore, conveyed to the Wyoming Game and Fish Commission?

FACTS
I. Property Ownership History
[¶ 5] The property at issue here, Section 16, Township 27 North, Range 83 West of the 6th Prime Meridian ("Section 16"), was granted to the State of Wyoming for the benefit of common schools upon admission as a state. See The Wyoming Act of Admission, ch. 664, § 4, 26 Stat. 222 (1890). In 1975, the federal government issued a land patent for Section 16 to the State of Wyoming. Dome Rock Reservoir ("reservoir"), also known as Indian Creek Reservoir, is located entirely within the boundaries of the property, and is considered a trophy fishery.
[¶ 6] In 1992, Mr. Frederick Werner proposed a sale of Section 16. At that time, the property was leased for grazing and agricultural purposes to Ralph Crow and John Anselmi. The Board gave preliminary approval of the sale at its May 7, 1992 meeting. However, after approval of the sale, the public voiced concern in opposition to the sale, fearing loss of access to the reservoir for public fishing. A public hearing was held and, as a result of comments at the hearing, the Board decided it would grant an easement to the Wyoming Game and Fish Commission ("Game and Fish") to preserve public access to the reservoir. At its public meeting on January 7, 1993, the Board approved an easement application from Game and Fish. The application for easement specifically requested:
. . . an easement to provide public vehicular road access, a parking lot, and a 50' wide fishing easement around the shoreline of Dome Rock Reservoir. The entire acreage will encompass approximately 12.30 acres. . . . The easement also grants the Wyoming Game and Fish any water *1113 rights that the Board may own in the reservoir.
The Board's approval was documented in Board Matter E-1A. Game and Fish paid the Board $26,500, the market value of the easement.
[¶ 7] The Board approved Section 16 for sale at its public meeting on April 1, 1993. The Board set the appraised value of the property at $91,000, the market value of the property after the easement to the Game and Fish, and authorized the Director of the Wyoming State Land and Farm Loan Office (now known as the Office of State Lands and Investments) to schedule, advertise, and conduct the public auction with a minimum bid of $91,000. The Notice of Sale of State Land indicated that the land was being sold subject to the Game and Fish easement, stating:
The above described land will be sold subject to any rights-of-way or easements, including approximately 12.3 acres to the Wyoming Game and Fish [Commission] for a fishing easement, access road, and parking area at Dome Rock Pond, or any previously granted interest in the land.
[¶ 8] Mr. John Anselmi purchased the property for $120,000 at a public auction held in Rawlins, Wyoming. On June 3, 1993, Mr. Anselmi and the Board executed an Amortization Sales Contract ("Sales Contract") which provided:
These lands are conveyed subject to any rights-of-way or easements of record previously granted under the laws of the State of Wyoming or reserved to the United States upon or across the above described lands.
The Amortization Sales Contract was recorded in the Office of the County Clerk for Carbon County on June 16, 1993. Mr. Anselmi assigned the Sales Contract to the Bentleys on October 12, 2000. He also provided a warranty deed to the Bentleys stating that the property was subject to "all easements, reservations, restrictions and rights-of-way of record or apparent upon the ground."
[¶ 9] On November 28, 2000, Easement No. 5382 was executed by the Governor and the Director of the Office of State Lands. The easement was recorded in the Carbon County Clerk's Office on November 29, 2000. This easement included use of the access road, parking area, and the fishing easement around the reservoir. On its face, the easement does not convey any water rights to the Game and Fish. However, it does incorporate by reference Board Matter E1-A which grants "any water rights that the Board may own in the reservoir."
[¶ 10] On May 16, 2002, the State of Wyoming, in consideration of full payment and in conformity with Wyo. Stat. Ann. § 36-9-112, issued a patent conveying the property to the Bentleys. The patent conveys the property "[s]ubject to any and all rights of way or easements of record previously granted under the laws of the State of Wyoming or reserved to the United States upon or across the above described lands." The patent also states that the conveyance is:
Subject to the legal operation and effect of a Grant of Easement dated as of January 7, 1993 by the State of Wyoming to Wyoming Game and Fish Commission, recorded on November 29, 2000 in the Carbon County Clerk's Office in Book 994, at Page 183, including the water rights described in the grant thereof and appurtenant thereto[.]
The patent was recorded in the Carbon County Clerk's Office on May 24, 2002. The public continues to use the reservoir for fishing and other recreation.
II. Water Rights
[¶ 11] The Dome Rock Reservoir is an on-channel facility along Indian Creek, entirely located within Section 16. Permit No. 6002RES, the primary permit, allowed the creation of the reservoir and provides for the storage of 65.15 acre-feet of water within the Dome Rock Reservoir. Permit No. 6002RES has a priority date of July 21, 1952 and is in good standing.
[¶ 12] Secondary permits, which granted the authority to appropriate the stored waters of the reservoir to beneficial use are Permit No. 21152 (the Indian Grove Ditch No. 3), Permit No. 21154 (the Indian Ditch), and Permit No. 21155 (the Indian Grove Ditch No. 4). These three secondary permits allocate the entire capacity of the reservoir *1114 to lands within Sections 16 and 21.[1] The Bentleys currently own all the lands in Sections 16 and 21 that benefit from the water rights preserved in the permits.[2]
III. Proceedings Below
[¶ 13] On September 29, 2004, the Bentleys filed their Complaint for Declaratory and Injunctive Relief, Quiet Title, and Damages for Trespass. With respect to the easement, the Bentleys claimed that the easement was not valid, sought to quiet title, and requested damages for trespass and a temporary taking. With respect to the water rights, the Bentleys took the position that, as owners of the lands benefiting from the use permits, they are the owners of the water in the reservoir.[3] Appellees filed a Motion to Dismiss pursuant to W.R.C.P. 12(b)(6), for failure to state a claim upon which relief can be granted. The district court granted that motion in part, disposing of the Bentleys' first, second, fifth, and sixth causes of action, ruling that the Game and Fish holds a valid easement. The district court denied the motion to dismiss the Bentleys' third and fourth causes of action pertaining to water rights associated with Section 16. Subsequently, the parties submitted cross-motions for summary judgment on the Bentleys' water rights claims. The district court resolved the case by granting summary judgment in part for both parties. It concluded that the water rights for irrigation of Section 16 were conveyed to the Game and Fish, but that the Bentleys own the water rights appurtenant to Section 21. The Bentleys appealed.

DISCUSSION
I. Dismissal of Easement Claims
[¶ 14] The Bentleys challenge the district court's dismissal of their claims seeking to extinguish the easement and recover damages. The district court concluded that the Bentleys' easement-related claims  styled as actions seeking declaratory relief, quiet title, trespass damages, and compensation for taking  failed to state any claims upon which relief could be granted. Pursuant to W.R.C.P. 12(b)(6), the district court granted Appellees' motion to dismiss.
[¶ 15] On appeal, the Bentleys claim that their ownership of Section 16 is not subject to the easement because: 1) the easement was not created and validly established prior to their purchase of the property; and 2) they had no notice of the easement at the time they purchased the property. Invoking bona fide purchaser status, they assert the easement cannot be enforced against them, relying upon the operation of Wyo. Stat. Ann. § 34-1-120. The Bentleys' argument is premised on the nature of the State's ownership after the Sales Contract was executed. As stated in their brief, "as of June 3, 1993, the State of Wyoming no longer owned Section *1115 16; and therefore, no longer owned any interest in which to convey an easement." The Bentleys contend that any interest granted by the State after June 3, 1993, cannot be enforced against them.
[¶ 16] This Court will sustain a dismissal only if the complaint shows on its face that the plaintiff was not entitled to relief under any set of facts. Hochalter v. City of Gillette, 2005 WY 125, ¶ 9, 120 P.3d 674, 677 (Wyo.2005); Natrona County v. Blake, 2003 WY 170, ¶ 5, 81 P.3d 948, 950-51 (Wyo.2003). The "facts alleged in the complaint are admitted and the allegations must be viewed in the light most favorable to plaintiffs. Dismissal is a drastic remedy, and is sparingly granted." Cranston v. Weston County Weed & Pest Bd., 826 P.2d 251, 254-55 (Wyo.1992); Darrar v. Bourke, 910 P.2d 572, 575 (Wyo.1996); Wilson v. Town of Alpine, 2005 WY 57, ¶ 4, 111 P.3d 290, 291 (Wyo.2005).
[¶ 17] The Bentleys' complaint describes or incorporates several documents pertaining to Section 16. We find it helpful to begin our discussion by examining these instruments, determining the nature of the interests created, and the legal effect. We consider first the instruments pertaining to the Bentleys' ownership, followed by analysis of the easement. Finally, we discuss the interplay between the instruments to determine whether the Bentleys stated any claims for relief concerning the easement.
A. Bentleys' Ownership
1. Sales Contract
[¶ 18] After he was the successful bidder at the public auction, Mr. Anselmi and the State entered into the Sales Contract on June 3, 1993. The Sales Contract was an installment land contract, specifically authorized by statute.[4] In an installment land contract, the seller agrees to accept payments from the buyer, usually over a period of time, until the price set by the contract has been paid. In re Estate of Ventling, 771 P.2d 388, 389 (Wyo.1989). When all payments have been made, the seller is bound to convey title to the buyer. Id.
[¶ 19] Pursuant to Wyo. Stat. Ann. § 36-9-107(b) (LexisNexis 2005), the buyer must record an installment contract for the purchase of state lands in the county where the property is located. The Sales Contract was recorded in Carbon County on June 16, 1993.[5] Throughout their appeal, the Bentleys *1116 attribute significance to the date of the Sales Contract.
[¶ 20] However, both the statutory provisions governing the sale of public lands and our jurisprudence recognize that even after the date of the Sales Contract, legal title remained with the State. Pursuant to Wyo. Stat. Ann. § 36-9-112(a), fee ownership of Section 16 could be transferred only by patent. That provision states:
Whenever the purchaser of any state land, or his assign, has complied with all the conditions of this act and has paid all the purchase money therefor, together with the lawful interest thereon, he shall receive a patent for the land purchased. Such patent shall run in the name of the state of Wyoming, it shall be signed by the governor, and countersigned by the director, and attested by the seal of the board. Such patent signed and executed as aforesaid shall convey a good and sufficient title to the patentee therein named. A fee interest in any state land may be perfected only as herein provided and only by express grant by the state of Wyoming for that purpose.
Wyo. Stat. Ann. § 36-9-112(a) (LexisNexis 2005) (emphasis added).
[¶ 21] The Bentleys generalize the Sales Contract as the "purchase" of Section 16. They fail to recognize that, when the Sales Contract was assigned to them, it was still an executory contract and remained so until its terms were fulfilled. A contract is executory "where something remains to be done by one or more of the parties" and a "contract for the sale of land is wholly executory until the conveyance is made." State Highway Comm'n v. Rollins, Wyo., 471 P.2d 324, 327 (1970), quoting 8A, Thompson on Real Property, § 4441, pp. 249-50 (1963 Repl.). An installment land contract is a contract for sale, not a sale in itself. Id.
[¶ 22] Long ago, this Court construed statutory provisions governing the disposition of state lands similar to those applicable in this case and considered the buyer's interest under an installment contract. Olds v. Little Horse Creek Cattle Co., 22 Wyo. 336, 140 P. 1004 (1914). Olds clearly identifies the buyer's interest as equitable, and incomplete, in nature. 140 P. at 1008. The buyer "does not acquire a complete equitable title until upon paying the purchase-money and complying with the other conditions precedent he has become entitled to a conveyance." Id. The State possesses the same rights as any other seller under an installment land contract and continues to retain legal title to the property. Id. at 1008-09. Until the full purchase price is paid, the State "is not bound to convey; there are many uncertain events to happen before it will be known whether [it] will ever have to convey, and [it] retains for certain purposes, [its] old dominion over the estate." Id. at 1008. Therefore, the Bentleys could not acquire full "equitable title" until they were entitled to a patent, i.e., when full payment under the Sales Contract had been made. Id. at 1011. Since our decision in Olds, our jurisprudence has affirmed that a buyer's interest under an installment land contract is equitable in nature, and legal title remains with the seller. Ventling, 771 P.2d at 389. Thus, under the executory Sales Contract, the State retained legal title to Section 16 and transferred only a limited equitable interest.
2. Assignment to Bentleys
[¶ 23] On October 12, 2000, Mr. Anselmi assigned his interest in the Sales Contract to *1117 the Bentleys.[6] Applying the principles outlined above, it is evident that the Bentleys acquired a limited equitable interest in Section 16 from Mr. Anselmi. The Sales Contract, as assigned, was still executory, and neither Mr. Anselmi nor the Bentleys were entitled to a conveyance of legal title until the conditions of the Sales Contract were performed. Through the assignment, the Bentleys took the place of Mr. Anselmi, assuming the risks inherent in purchasing an equitable interest, which is subject to outstanding equities and possible imperfections. 77 Am.Jur.2d Vendor and Purchaser § 373 (2006). In Caldwell v. Bush, 6 Wyo. 342, 353, 45 P. 488, 490 (1896), we highlighted the uncertainty of purchasing such an equitable interest noting, "the doctrine of caveat emptor applies."
3. Patent to Bentleys
[¶ 24] After the Bentleys made full payment under the Sales Contract, they received a patent in accordance with Wyo. Stat. Ann. § 36-9-112(a). Patent number 2992 issued on May 16, 2002, and was recorded on May 24, 2002. The patent specifies that the Bentleys' title to Section 16 is subject to the easement. Although the Bentleys have framed their causes of action and arguments on appeal as if there are inconsistent claims to Section 16, the patent is consistent with the existence of the easement.
[¶ 25] The Bentleys' real complaint is that they do not believe their patent conveyed all they were entitled to receive under the Sales Contract. However, once a contract for the sale of realty has been executed, its provisions merge with the conveyance and are no longer separately enforceable. Rehnberg v. Hirshberg, 2003 WY 21, ¶ 13, 64 P.3d 115, 119 (Wyo.2003). The Bentleys' rights are therefore controlled by the patent. Id. See also Bakken v. Price, Wyo., 613 P.2d 1222, 1227-29 (1980). Because the patent specifies that title is subject to the easement, the Bentleys' title is indeed subject to the easement.
4. Equitable Doctrines
[¶ 26] The Bentleys acknowledge that they did not obtain legal title until the patent issued in 2002, but they assert that two principles  relation back and equitable conversion  apply under the circumstances. According to the Bentleys, equity transforms the nature of the interests discussed above to recognize in them full ownership of Section 16 prior to the patent. They reason that their full ownership in Section 16 thereafter divested the State of the ability to convey an easement to Game and Fish. As explained below, however, we do not find either of the equitable doctrines to have that effect.
a) Doctrine of Relation
[¶ 27] The Bentleys contend the patent relates back to the inception of their interest in Section 16. According to them, relation back makes their patent effective as of June 3, 1993, the date of the Sales Contract. The Bentleys rely upon Roberts v. Hudson, 25 Wyo. 505, 507-10, 173 P. 786, 787-88 (Wyo.1918), where the doctrine of relation was applied to uphold a mortgage granted by a patentee prior to receiving his patent. Roberts involved patented lands acquired by entry. The Court observed, "[t]he general [principle] unquestionably is, that a Government patent, when issued, relates back to the original entry, and perfects and makes valid any attempted transfer by the patentee intermediate the entry and patent." Id. at 787.
[¶ 28] The Bentleys do not find any meaningful distinction between the equitable interest acquired by entry in Roberts and their interest under the Sales Contract. However, one distinction is clear: the patentee in Roberts had achieved complete equitable ownership by fulfilling every condition necessary to his patent. "Having made his filing, paid the initial payment, made proofs of the required expenditures for the three years and having submitted his final proof *1118 before he gave the mortgage he had then done all that he was then required to do or could do to entitle him to a patent." Roberts, 173 P. at 787 (emphasis added). Here, there is no dispute that the conditions of the Sales Contract were not satisfied on June 3, 1993.
[¶ 29] Still, we have held that an imperfect equitable right in land may suffice to apply the doctrine of relation. Walliker v. Escott, Wyo., 608 P.2d 1272, 1277 (1980). In Walliker, the patentee had given quitclaim deeds to third parties before receiving her patent. The deeds were upheld, as equity required. Id. As a function of equity, the contours of the doctrine of relation are difficult to state with precision. Recently, we recognized Walliker as presenting "a classic relation-back case, founded in the traditional land entry to patent rationale." Kennedy Oil v. Lance Oil & Gas Co., 2006 WY 9, ¶ 19, 126 P.3d 875, 881 (Wyo.2006). Ultimately, the doctrine "is a fiction of law resorted to whenever justice requires." Roberts, 173 P. at 787.
[¶ 30] In contrast to Walliker, this is not a classic relation back situation. Even when viewed in a light most favorable to the Bentleys, it is clear they seek relation back of a legal title they have not acquired. They claim entitlement to an unencumbered fee interest in Section 16, free from the easement, under the Sales Contract. However, we have never applied the doctrine of relation to rectify a perceived deficiency in a patent, i.e., the owner's claim that his earlier, equitable interest was not fully realized by the conveyance. The Bentleys provide no legal authority for this novel use of the doctrine of relation.
[¶ 31] The Section 16 patent, by its terms, conveyed title subject to the easement. Even if we were to conclude that the patent related back to June 3, 1993, that legal fiction would not provide the Bentleys the relief they desire. Under these circumstances, the district court properly concluded that the Bentleys did not present any reason and justice did not require the application of the doctrine of relation.
b) Equitable Conversion
[¶ 32] The Bentleys assert that equity made them full owners of Section 16 and divested the State of ownership before the patent issued. Although they do not identify the doctrine of equitable conversion by that name, we interpret their argument as seeking its application. "The equitable conversion theory treats the interest of the purchaser to be tangible real estate from the time the installment land contract or contract for deed is executed and considers the purpose of the retention of title by the vendor to be a security interest, with the contractual right to the balance of the purchase price treated as personalty." Ventling, 771 P.2d at 390.
This rule, for many purposes, determines in equity the rights of the parties and others who have succeeded to the interest of either party by transfer or otherwise; and the rule is itself but the consequence of the familiar doctrine of courts of equity that for many purposes things agreed to be done are treated as if they were actually done. . . .
Olds, 140 P. at 1007. Stated another way, equitable conversion flows from the maxim that "equity regards and treats as done what, in good conscience, ought to be done." Ventling, 771 P.2d at 390.
[¶ 33] We rejected the application of equitable conversion to installment land contracts in both Ventling and Olds. Ventling noted the problems that may arise when equitable conversion is applied, and held that a judgment lien does not attach to the buyer's equitable interest. 771 P.2d at 390-392. Olds rejected application of the doctrine to obligate the buyer to pay taxes on state land, preventing that land from being sold at a tax sale. 140 P. at 1007-1013. This Court also rejected the doctrine in Moncrief v. Louisiana Land & Exploration Co., 861 P.2d 516, 518, 529 (Wyo.1993) (on rehearing, overruling Moncrief v. Louisiana Land & Exploration Co., 861 P.2d 500 (Wyo.1993) (applying equitable conversion to farm-out agreement)).
[¶ 34] In support of their claim that their equitable interest in Section 16 was the equivalent of full ownership, the Bentleys rely upon language appearing in Pedro/Aspen, *1119 Ltd. v. Board of County Comm'rs, 2004 WY 84, ¶¶ 17-18, 94 P.3d 412, 418 (Wyo. 2004), Dubray v. Howshar, 884 P.2d 23, 26 (Wyo.1994), and Mayflower Restaurant Co. v. Griego, 741 P.2d 1106, 1113 (Wyo.1987). Taken out of context, quoted portions from these cases seem to support the Bentleys' view. Mayflower, 741 P.2d at 1113 ("When property is sold under a valid contract and an escrow created, the purchaser under the contract is the equitable owner and assumes all the risk, including liability of ownership, while the seller holds legal title in trust for the purchaser as security for the performance of the contract."); Dubray, 884 P.2d at 26; Pedro/Aspen, ¶ 17, 94 P.3d at 418 ("We have held the vendor under a typical contract for deed has parted with title, possession, and control of the property.").
[¶ 35] However, the cases the Bentleys rely upon did not involve questions of title and competing claims to property. Mayflower and Dubray addressed tort liability and the duty of vendors of property in that regard. Mayflower, 741 P.2d at 1113; Dubray, 884 P.2d at 26. In Pedro/Aspen, a buyer under a contract for deed was held to have standing to challenge a county's zoning regulation. Pedro/Aspen, ¶¶ 15-23, 94 P.3d at 417-19. We do not disagree that an equitable interest in property may be relevant to inquiries regarding standing to maintain a suit or premises/tort liability. When these cases are considered in context, however, they simply do not provide support for the Bentleys' claims in this case. Again, the Bentleys' complaint demonstrates that their interest under the Sales Contract was an incomplete equitable interest, and legal title to Section 16 remained with the State.
B. Easement
[¶ 36] The Bentleys challenge the validity of the easement, in large part, based upon their understanding of their ownership interest in Section 16 at various points in time. As to the recorded grant, they assume that the State lacked any ability to make that conveyance in 2000 because it had previously conveyed Section 16 pursuant to the Sales Contract. The Bentleys therefore focus upon the Board's actions in early 1993 and conclude that no valid easement predates the Sales Contract.
1. Board Matter E-1A
[¶ 37] The district court found that Board Matter E-1A created a valid easement. Board Matter E-1A describes the Game and Fish request for "an easement to provide public vehicular road access, a parking lot, and a 50' wide fishing easement around the shoreline of Dome Rock Reservoir. The entire acreage will encompass approximately 12.30 acres. . . . The easement also grants the Wyoming Game and Fish any water rights that the Board may own in the reservoir." Board Matter E-1A also documents Board approval of the Game and Fish application. The Bentleys' complaint also recites that Game and Fish paid $26,500 in exchange for the easement encompassing approximately 12.3 acres.
[¶ 38] No official grant of easement was recorded until 2000. The Bentleys claim that the failure to formalize the grant and to record it in a timely fashion renders the easement unenforceable against them.[7] We agree with the Bentleys that the Board's approval lacked material terms and formalities required in a formal conveyance of an interest in state land, but we also agree with the district court that the intent to create an easement was demonstrated by the Board's actions. Board Matter E-1A showing the application, approval, and recited consideration, reflected a clear intent to convey the easement in the future. 4 Powell on Real Property § 34.05 (Michael Allan Wolf ed., 2007). This documented intent may not have the formal, legal significance of creating an easement, but it is highly relevant to a determination *1120 of competing equitable interests in land. Id.
2. Easement No. 5382
[¶ 39] The Board of Land Commissioners has discretionary authority to grant public easements over state lands. Wyo. Stat. Ann. § 36-9-118 (LexisNexis 2005) provides:
The board of land commissioners may, at their discretion, grant permanent rights-of-way or easements across or upon any portion of state or school lands, upon such terms as the board may determine, for any ditch, reservoir, railroad, public highway, telegraph and telephone lines, or other public conveyances.
Having already determined that the State held legal title to Section 16 on the date it granted the easement, we reject the Bentleys' repeated assertions that the November 28, 2000 grant was void on that basis.
C. Which Instrument/Interest Prevails?
1. Recording Act and Bona Fide Purchaser Status
[¶ 40] The parties have asserted various arguments regarding "notice" without the benefit of an orderly or meaningful analysis of the various legal and equitable interests involved. We begin with the pertinent provision of the recording act:
§ 34-1-120. Unrecorded conveyance void as to subsequent purchasers recording first.
Every conveyance of real estate within this state, hereafter made, which shall not be recorded as required by law, shall be void, as against any subsequent purchaser or purchasers in good faith and for a valuable consideration of the same real estate or any portion thereof, whose conveyance shall be first duly recorded.
To prevail in a contest under Wyo. Stat. Ann. § 34-1-120 (LexisNexis 2005), the Bentleys must show that they have the status of a "bona fide purchaser," which is: (1) a purchaser in good faith; (2) for a valuable consideration, not by gift; (3) with no actual, constructive or inquiry notice of any alleged or real infirmities in the title; and (4) who would be prejudiced by the cancellation or reformation. Grose v. Sauvageau, 942 P.2d 398, 402 (Wyo.1997). The Bentleys do not discuss their burden in this regard. Rather, they simply assume that they are bona fide purchasers under Wyo. Stat. Ann. § 34-1-120 and are entitled to void the easement. We gather that they reach this conclusion because the Sales Contract was recorded on June 16, 1993, before the easement was recorded in 2000.
[¶ 41] The State asserts that the easement was created and placed of record prior to 2000. The State suggests that Matter E-1A and related documents predating Easement No. 5382 were recorded because they were available to the public at the Office of State Lands and Investments. We have expressly rejected the notion that such filings amount to recording under the recording act. Torgeson v. Connelly, Wyo., 348 P.2d 63, 66 (1959). "[T]he Wyoming legislative provisions are definite that the filing or leaving of a conveyance in any office other than that of the register of deeds cannot constitute constructive notice." Id. Thus, we focus upon Easement No. 5382, recorded on November 29, 2000, as the only conveyance pertaining to the easement which was recorded in the real property records in Carbon County.
[¶ 42] The Bentleys assert they were purchasers in good faith whose conveyance was recorded prior to Easement No. 5382 and, therefore, their ownership of Section 16 is not subject to the easement. A statutory definition for purchaser is provided: "The term `purchaser', as used in this act shall be construed to embrace every person to whom any estate or interest in real estate shall be conveyed for a valuable consideration, and also every assignee of a mortgage or lease, or other conditional estate." Wyo. Stat. Ann. § 34-1-101 (LexisNexis 2005). Conveyance is also defined by statute:
The term "conveyance", as used in this act, shall be construed to embrace every instrument in writing by which any estate or interest in real estate is created, alienated, mortgaged or assigned, or by which the title to any real estate may be affected in law or in equity, except wills, leases for a term not exceeding three (3) years, executory contracts for the sale or purchase *1121 of lands, and certificates which show that the purchaser has paid the consideration and is entitled to a deed for the lands, and contain a promise or agreement to furnish said deed at some future time.
Wyo. Stat. Ann. § 34-1-102 (LexisNexis 2005) (emphasis added).
[¶ 43] We accept that the Bentleys, who were paying valuable consideration and expecting a conveyance of Section 16, were "purchasers" within the meaning of the recording act. However, they did not receive a conveyance to Section 16 until they received the patent. The Sales Contract was an executory contract, specifically excluded from the statutory definition of conveyance. Accordingly, the fact that the Sales Contract was recorded does not change the operation of Wyo. Stat. Ann. § 34-1-120.[8] By its express terms, the statute provides no protection for a purchaser who was not the first to record a conveyance. For purposes of this appeal, the first conveyance to be recorded was Easement No. 5382. The Bentleys' conveyance, the patent, was recorded two years later.
[¶ 44] Moreover, the Bentleys are likewise ineligible for protection under the recording act because they cannot demonstrate that they are bona fide purchasers. Under the third prong of that inquiry, the Bentleys would have to prove that they lacked "actual, constructive or inquiry notice of any alleged or real infirmities in the title" to Section 16. Grose, 942 P.2d at 402. This they cannot do. While they might not have discovered documentation of the easement before they received their assignment from Mr. Anselmi, the assignment itself reflects a defect in the title, i.e., it was retained by the State. Any effort to check the county clerk's records would have revealed that Mr. Anselmi lacked the ability to convey legal title to Section 16. It is apparent that the Bentleys did not make such efforts.
[¶ 45] The Bentleys' claims that they lacked notice of the easement are solidly refuted by the very facts alleged in their complaint. Their complaint states that at the time of their purchase, Section 16 featured a roadway to the reservoir, a parking lot, and signs announcing that the reservoir is a public fishery. Also, members of the public used the fishery. According to the Bentleys, that public use was known to them and was ongoing. The improvements visible upon physical inspection of the property, as well as the continual access and use by the public, provided inquiry notice of an easement. Perhaps conceding the import of these facts, counsel for the Bentleys admitted actual knowledge of the easement at the *1122 hearing on the motion to dismiss.[9]
[¶ 46] As the foregoing demonstrates, the Bentleys' reliance upon the recording act to void the easement is misplaced.[10] The protections afforded by recording acts generally do not extend to equitable interests as such holders are not considered bona fide purchasers. 77 Am.Jur.2d Vendor and Purchaser § 355 (2006); See also 77 Am.Jur.2d Vendor and Purchaser § 373, § 375, § 376 (2006). It is apparent from their pleading that the Bentleys are not entitled to relief under Wyo. Stat. Ann. § 34-1-120.
2. Equity
[¶ 47] A purchaser under an installment contract, although lacking a conveyance, may have a remedy in equity. However, resort to principles of equity is of no assistance to the Bentleys. Their equitable interest was preceded in time by a public interest, documented in public records, of which they had knowledge.
[¶ 48] When the recording act does not control, a pertinent common law maxim is "he who is first in time has the better right." Low v. Sanger, Wyo., 478 P.2d 60, 63 (1970). The inchoate, equitable interest purchased by Game and Fish arose prior to the Bentleys' equitable interest under the Sales Contract. Generally, "[t]he equitable interest of a purchaser under a contract of sale is subject to the interest of a person claiming under the vendor under a prior transaction, whether such prior transaction was effective to give a legal interest or merely an equitable interest." 77 Am.Jur.2d Vendor and Purchaser § 355 (2006) (footnote omitted). "Where the purchase is only of an equitable title, it is ordinarily taken with all its imperfections and outstanding equities, notwithstanding the fact that a valuable consideration may have been given and that there may have been no notice of the equity or defense against the title." 77 Am.Jur.2d Vendor and Purchaser § 373 (2006). Accordingly, the Bentleys' ownership of Section 16 could equitably be made subject to a prior equitable interest, even if they had no knowledge of it.
[¶ 49] However, the Bentleys did have knowledge of public use. There is no indication that they possessed Section 16 in a manner that was inconsistent with the easement. The public continued to access Dome Rock Reservoir without interference. In this case, equity favors upholding the easement which was prior in time to the Bentleys' interest, is consistent with the clearly expressed intent of the Board and Game and Fish, and ultimately benefits the public.
[¶ 50] Overall, the Bentleys complain that a provision of the Sales Contract was not fulfilled because the State granted something less than the fee interest they were promised. We would make several observations to counter the unfairness they perceive. First, the Bentleys were not without legal remedy. They did not assert a claim based upon a breach of contract theory, nor did they seek to enforce or rescind the Sales Contract.[11] Second, Mr. Anselmi never bargained for a fee interest free from the easement. The public auction advertised Section 16 as being subject to the easement, and Mr. Anselmi's bid logically took this encumbrance into account. Finally, we have considered the countervailing equities. The easement was requested, approved, and paid for before the Bentleys entered the picture. While they argue that they did not receive the full benefit of their bargain, they fail to appreciate that the public is equally deserving of the benefit of Game and Fish's bargain. This benefit has been continuously enjoyed by the fishing and recreating public, and the Bentleys *1123 were aware of this use of their property long before they instituted this action.
[¶ 51] Having reviewed the Bentleys' complaint and the documents attached thereto, we find that the Bentleys failed to state a claim which would invalidate or extinguish the easement. The district court properly dismissed the claims premised upon the Bentleys' assertions that their ownership of Section 16 was not subject to the easement.
II. Summary Judgment on Water Rights Claims
[¶ 52] As we set forth above, there are three permits associated with the use of the water stored in the reservoir. The three permits allocate the entire capacity of the reservoir. The Bentleys currently own all of the lands in Section 16 and in Section 21 that benefit from the reservoir permits. They contend the easement could not have severed the water rights because the legal owner of the intended lands also owns the water rights.
[¶ 53] In its ruling on summary judgment, the district court ruled that the water rights for irrigation of Section 16 were conveyed with the easement and are now owned by Game and Fish. The district court also ruled that the rights for irrigation of Section 21 were not conveyed with Section 16, but rather remain appurtenant to Section 21 and thus are owned by the Bentleys. The Bentleys have appealed only the portion of the ruling concerning the Section 16 rights.
[¶ 54] In reviewing a district court's grant of summary judgment, the standards we apply are well established:
The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. Reed v. Miles Land and Livestock Company, 2001 WY 16, ¶ 9, 18 P.3d 1161, ¶ 9 (Wyo.2001). A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. Scherer Construction, LLC v. Hedquist Construction, Inc., 2001 WY 23, ¶ 15, 18 P.3d 645, ¶ 15 (Wyo.2001); Central Wyoming Medical Laboratory, LLC v. Medical Testing Lab, Inc., 2002 WY 47, ¶ 15, 43 P.3d 121, ¶ 15 (Wyo.2002).
Mueller v. Zimmer, 2005 WY 156, ¶ 3, 124 P.3d 340, 346 (Wyo.2005). Questions of law are reviewed de novo. Martin v. Committee for Honesty and Justice, 2004 WY 128, ¶ 8, 101 P.3d 123, 127 (Wyo.2004). "We may uphold the grant of summary judgment upon any proper legal ground finding support in the record." Coates v. Anderson, 2004 WY 11, ¶ 5, 84 P.3d 953, 956 (Wyo.2004).
[¶ 55] As a general rule, a water right beneficially used upon land becomes appurtenant to the land. Condict v. Ryan, 79 Wyo. 211, 228-29, 333 P.2d 684, 689 (1958); Sturgeon v. Brooks, 73 Wyo. 436, 455-56, 281 P.2d 675, 682 (1955); Frank v. Hicks, 4 Wyo. 502, 530-31, 35 P. 475, 484 (1894). And, when the land is conveyed, the water right passes with it. In Condict we explained, "when a permit to construct a reservoir is granted upon condition that the impounded water is to be used upon particular lands, the right to the use of those waters is not a mere personal right, but is a right running with the land and it passes with a conveyance of the land even in the absence of special mention." 333 P.2d at 688. However, in this case, the water rights could be, and were, identified and separately transferred to the Game and Fish. See Sturgeon, 281 P.2d at 682-83 (stored water rights can be severed from the lands to which they have been attached).
[¶ 56] In Matter E-1A, the Board stated its intent to sever its ownership and transfer "any water rights that the Board may own in the reservoir." Subsequently when the easement was conveyed, the Board still held legal title to Section 16 and, thus, also owned the water rights attached to it. The recorded easement attached and incorporated Board Matter E-1A. We agree with *1124 the district court that the easement conveyed the reservoir rights to the Game and Fish and severed them from Section 16.
[¶ 57] The Board clearly indicated its "intention to convey specific property." King v. White, Wyo., 499 P.2d 585, 588 (1972). Although the Board's reference to "any rights" language could have been more precise, there is no question which reservoir was involved because Dome Rock Reservoir is the only reservoir on Section 16 and was also the subject of the easement. It is obvious that water in the reservoir is essential to a public fishery, the interest served by the easement. The only water rights in the reservoir owned by the Board at the time were represented by Permits 6002RES, 21152, 21154, and 21155. Thus, the Board sufficiently demonstrated its intent to convey its water rights to Game and Fish, along with the easement. This intent was manifested in the patent, which excludes the reservoir water rights.
[¶ 58] The Bentleys also assert that the conveyance was invalid and could not have severed the water rights because the Board did not petition the State Engineer's Office for change in use, change in point of diversion, enlargement of use, or change in place of use of the water. The water rights at issue are for stored water, not "for the direct use of the natural unstored flow of any stream." Wyo. Stat. Ann. § 41-3-101 (LexisNexis 2005). The Bentleys appear to overlook this distinction.[12] The fact that the reservoir rights were permitted for irrigation does not impact the ownership of the rights conveyed by the Board when it granted the easement to the Game and Fish.[13]
[¶ 59] Additionally, the Bentleys claim that the indications of an easement upon Section 16 would not have alerted them to the transfer of water rights in Dome Rock Reservoir. While that may be true, as discussed above, the Bentleys' claims that they lacked notice are unavailing because they accepted an assignment of a mere equitable interest, subject to all imperfections and competing claims.[14]

CONCLUSION
[¶ 60] We find the Bentleys failed to state a claim for relief which would invalidate the easement, and the district court properly dismissed those causes of action. Their equitable interest in Section 16 did not prevent the Board from granting a valid easement to Game and Fish. We also conclude that the district court was correct in holding that the water rights associated with Section 16 were severed and conveyed to the Game and Fish with the easement.
[¶ 61] Affirmed.
NOTES
[1] Permit No. 21152 provides for the irrigation use of 15.83 acre-feet of water stored within the reservoir as secondary supply for 18.9 acres of land located in Section 16 and served by the Indian Grove Ditch No. 3. Permit No. 21154 provides for the irrigation use of 12.56 acre-feet of water stored in the reservoir as secondary supply for lands covered by Permit No. 21153, and both permits authorize the diversion and appropriation of water through the Indian Ditch. The intended lands under the Indian Ditch involve a total of 15.0 acres located in Section 16. Finally, Permit No. 21155 provides for the irrigation use of 36.76 acre-feet of water stored in the reservoir as secondary supply for lands described under Permit No. 10157, and both permits authorize the diversion and appropriation of water through the Indian Grove Ditch No. 4. The intended lands under Indian Grove Ditch No. 4 involve a total of 43.9 acres, 39.1 of which are located in Section 21 and 4.8 of which are located in Section 16.
[2] The Bentleys apparently own other water rights appurtenant to Section 16, which are not at issue in this case.
[3] The Bentleys asserted the following claims for relief: (1) Quiet Title to Fix the Status of the Real Property with Respect to Ownership; (2) Declaratory Judgment to Ascertain and Establish the Status of the Real Property with Respect to Ownership; (3) Declaratory Judgment to Ascertain and Establish the Plaintiffs' Right to Use Water Appurtenant to the Real Property; (4) Permanent Injunction Prohibiting Interference with any Lawful Appropriation of Water from any Surface, Underground, or Reservoir Water Source Located on, or Appurtenant to, Sections 16 and 21; (5) Declaratory Judgment to Establish a Temporary Taking of Private Property in Violation of the United States Constitution and the Constitution of the State of Wyoming; and (6) Declaratory Judgment to Establish Damages for Trespass by the State of Wyoming and Members of the General Public.
[4] Wyo. Stat. Ann. § 36-9-107 (LexisNexis 2005) states:

(a) The terms of payment for school and state lands shall be as follows: not less than twenty-five percent (25%) of the purchase price in cash on day of sale, the balance is not to exceed thirty (30) equal annual payments figured on the amortization plan, which shall include interest on the deferred part of the payments at a rate of interest established by the board in accordance with current [interest] rates. The interest rate on all amounts not paid when due shall be established by the board in accordance with current lending practices. The purchaser may pay in full at the time of the sale or payment of any installment may be made at any time if accrued interest is paid to the time of payment.
(b) When school or state lands are sold under an installment contract the state shall insert a provision that the vendee shall pay the taxes upon the fair value of the lands sold from the date of the contract. The provision is binding upon the vendee. The installment contract shall be recorded in the county wherein the lands are situated by the vendee within thirty (30) days following its execution.
Wyo. Stat. Ann. § 36-9-108 (LexisNexis 2005) defines amortization plan:
The amortization plan is hereby defined, when applied to state land contracts or certificates, as being that plan under which part of the principal is required to be paid each time interest becomes due and payable, and under which this part payment on the principal increases at each succeeding installment in the same amount that the interest payment decreases, so that the combined amount due on principal and interest on each due date remains the same until the loan is paid in full.
[5] Once an installment contract has been awarded for the purchase of state lands, the State is required to issue a certificate to the buyer for recordation. Wyo. Stat. Ann. § 36-9-109 (LexisNexis 2005). That provision states:

§ 36-9-109. Certificate of purchase; issuance and contents.
When any state land shall have been purchased according to law, the board shall make and deliver to the purchaser a certificate of purchase, which shall contain the name of the purchaser, a description of the land purchased, the sum paid, the sum remaining unpaid, the amount of annual payments, which shall include the accrued interest, upon the amortization plan as hereinbefore defined, and the date on which each of the deferred payments falls due. All annual payments shall be due and payable on the first day of December of each year, provided that interest is paid on the full amount of the deferred payments at the rate of four percent (4%) per annum from date of the sale to the first day of December following such date of sale.
The parties do not refer to any certificate and one does not appear in the record on appeal. However, the required contents of the certificate appear within the Sales Contract. For purposes of this appeal, we need not determine the legal impact of the absence of a certificate because it appears that the recorded Sales Contract served as a functional equivalent to give notice to third parties of Mr. Anselmi's interest in Section 16. In Olds v. Little Horse Creek Cattle Co., 22 Wyo. 336, 356-57, 140 P. 1004, 1011 (1914), we described the certificate as a condition precedent to the right to a patent, but that issue has not been raised by the parties, and we need not question the validity of the patent.
[6] When he executed the assignment, Mr. Anselmi also provided the Bentleys with a warranty deed for Section 16. Given our conclusion that the State retained title, it is clear that Mr. Anselmi never had legal title to Section 16. Consequently, he was never able to convey legal title to the Bentleys, via the warranty deed or otherwise. The Bentleys acknowledge that the warranty deed did not transfer title to them and do not rely upon it as the basis for their claims.
[7] Many of the arguments on appeal address the sufficiency of the Board Matter E-1A to create a legally valid easement. The focus upon the Board's actions in 1993 is a result of the Bentleys' erroneous conclusion that the State lost title to Section 16 after it entered into the Sales Contract with Mr. Anselmi. Having explained that the State retained legal title and the ability to convey, we need not discuss further the parties' arguments pertaining to the creation of an easement in 1993.
[8] We recognize that some may perceive a lack of harmony between Wyo. Stat. Ann. § 36-9-107(b), which requires recording of installment land contracts for state lands, and the exclusion from protection under the recording act against later recorded conveyances. As one commentator summarized decades ago:

The man who records a contract to sell land in Wyoming is like the farmer who puts a scarecrow in his cornfield. It may not be a real man, but it keeps the crows away. Recording of contracts for purposes of cutting off subsequent grantees isn't provided for in the statutes, but by decision it will shoo the crows away. Originally ours was an especially confusing situation both to the crows and to the farmer because of our recording scheme. One paragraph of the statute says that every instrument touching any interest in land which is recorded will be notice, and another provides an unrecorded conveyance is void as against a subsequent bona fide purchaser who first records. [The statute] defines a conveyance so that an executory contract is expressly excluded, and yet another permits the recording of an executory contract but does not say the record will be notice.
Robert S. Sturges, Recording the Land Contract, 6 Wyo. L.J. 208, 208 (1951-1952) (italics in original) (footnotes omitted). This discrepancy was addressed in Hawkins v. Stoffers, 40 Wyo. 226, 276 P. 452 (1929), reh'g denied, 40 Wyo. 226, 278 P. 76 (1929). Hawkins concluded the buyer under an installment contract had a paramount right to title against a prior purchaser who did not take possession or record his deed right away. 40 Wyo. at 248-254, 276 P. 452. The decision recognized that an executory contract was not a conveyance, but the buyer was nevertheless able to defeat a prior claim to the property because he had assumed possession. Id. at 248, 276 P. 452. Relying upon principles of justice and equity, the Court determined that the buyer's open and notorious possession provided notice equivalent to registration. Id. at 248-254, 276 P. 452. We consider Hawkins instructive in this case, in that it is apparent that principles of justice and equity, and not the provisions of the recording act, are the source of any relief for the Bentleys.
[9] In their brief(s), the Bentleys contend that there was no concession of this nature. However, we do not have a transcript of the hearing and, consequently, have no reason to question the district court's statement in its decision letter: "[Counsel] conceded in oral argument before this Court that Plaintiffs did in fact have notice of the easement in question before their purchase of the property. . . ."
[10] As previously noted, their patent does not conflict with the easement. See Condos v. Trapp, 739 P.2d 749, 750-751 (Wyo.1987) (suggesting recording act does not apply in the absence of conflicting conveyances).
[11] We also note that the Bentleys did not pursue any remedy they may have had against Mr. Anselmi in this action.
[12] "Water rights for the direct use of the natural unstored flow of any stream cannot be detached from the lands, place or purpose for which they are acquired. . . ." Wyo. Stat. Ann. § 41-3-101. By contrast, as set forth in Wyo. Stat. Ann. § 41-3-303 (LexisNexis 2005), the use of stored reservoir water may be acquired by agreement:

The use of water stored under the provisions of this chapter may be acquired under such terms as shall be agreed upon by and between the parties in interest. Lands entitled to the use of water in any reservoir may use the water stored therein, and to which they are entitled, at such times and in such amounts as the water users may elect, provided that a beneficial use of water is made at all times.
[13] The present use of the water rights by Game and Fish, i.e., whether that use is beneficial and requires changes to be made to the permits, should be determined by the State Engineer and/or the Board of Control.
[14] Even if we were to consider the state of the Bentleys' knowledge as material to the outcome of this portion of the appeal, we would have to consider the water report exhibits the Bentleys submitted in support of their motion for summary judgment. They claimed to have relied upon these documents when they purchased Section 16. The reports acknowledge the State's ownership in at least 50% of the water in the reservoir, recognize that the reservoir was made into a public trout fishery before Mr. Anselmi purchased Section 16 from the State, and opine that the reservoir had not been used for irrigation in recent years and "[t]o do so would almost certainly jeopardize the trout fishery."